HERBERT EVERETT MOSLEY, JR. *v.*
STATE OF MARYLAND

[No. 30, September Term, 1980.]

*Decided March 2, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Victoria Salner Keating, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Michael A. Anselmi, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court. COLE, J., dissents and filed a dissenting opinion at page 580 *infra.*

Petitioner Herbert Everett Mosley, Jr. was convicted by a jury in the Circuit Court for Montgomery County on April 3, 1979, of robbery with a deadly weapon, as well as of two related offenses. Mosley petitions this Court to overturn these convictions on the grounds that certain incriminating evidence, received at his trial, was obtained by the police through means that infringed upon his fourth amendment constitutional rights. Since we do not agree that this complained of police action violated any of those rights, we shall affirm the convictions and sentences.

On the evening of November 24, 1978, in an unmarked police vehicle, Corporal Daniel Wortman was patrolling the Hampshire-Langley Shopping Center in Takoma Park when his attention was drawn to two young men, one of whom is the petitioner in this case, standing on the sidewalk in front of a department store. Upon observing that both men "were turning their heads around [in] a 180°-fashion . . . looking up and down the parking lot," and alternately pacing back and forth while gazing through the plate glass window in the general direction of the cash registers in the store, Corporal Wortman situated his vehicle approximately 70-100 feet away to further observe their activity. From that vantage point, the officer observed one of the men enter the store, walk around the cash registers, pause momentarily to peruse the candy department located nearby and immedi-

ately exit. "After [each of the men] went in and out of the store about once or twice [more]," they continued to pace back and forth in front of the establishment for a period of about fifteen minutes. The two then walked from the store sidewalk into the parking lot to a yellow Pontiac approximately two hundred feet away that was situated across the painted lines taking up two parking spaces, so as to face an entrance-exit of the shopping center. With petitioner at the wheel, the automobile was "turned around and [the men] slowly started riding back down the shopping center in a kind of a slow manner." The officer at that point stopped the vehicle, advised the petitioner that he was acting suspiciously and asked to see his driver's license and registration card. Upon their production, Corporal Wortman ran a radio check to determine if there were any outstanding warrants in the driver's name. While waiting for a reply transmission, the officer, according to his testimony at the hearing on petitioner's motion to suppress, again approached Mosley stating that: "[he would] like to look in [the] vehicle as [he] had observed on the back floorboard behind the passenger side a large leather bag that reminded [him] of a pocket book and since there was no woman in the car [he] asked him if [he] could look at it." When the petitioner responded that he "didn't care if [he] looked at it," the officer reached into the car and pulled out what was in actuality a brief case. The corporal examined its contents and noted the existence of identification belonging to a black female, whom Mosley explained was his cousin. Upon further inquiry, however, Mosley could not recall either the age of his claimed cousin or her name. This failure caused the officer to radio the police dispatcher to check the name appearing on the identification. Following this transmission, additional officers in three police vehicles arrived a few minutes later to arrest the two suspects for an armed robbery earlier that evening of the woman whose name appeared on the identification. Upon their arrest, Mosley and his companion were immediately advised of their *Miranda* rights and taken to the police station where petitioner made an incriminating statement. At the pre-trial

hearing on the unsuccessful motion to suppress not only this statement, but also the brief case, its contents and a handgun found in the car following his arrest, Mosley explained his conduct at the department store by testifying that "it was two ladies at the cash register and then like we was admiring their shape so we were looking at the women." The petitioner further asserted that when Corporal Wortman requested permission to see the brief case, he refused, but the officer seized it anyway. Upon Mosley's conviction and its affirmance by the Court of Special Appeals, *Mosley v. State,* 45 Md. App. 88, 411 A.2d 1081 (1980), we granted certiorari to examine the propriety, under the fourth amendment, of the police actions in this case.

We first focus on petitioner's contention that the stop by Corporal Wortman of the automobile in which petitioner and his companion were riding was in violation of Mosley's fourth amendment right to be free from unreasonable searches and seizures. This Court is thus presented with the issue whether the police action here comported with the principles laid down by the United States Supreme Court over a decade ago in *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), which, in two instances in the recent past, we have had occasion to analyze and apply to differing factual patterns.[1] See *Watkins v. State,* 288 Md. 596, 420 A.2d 270 (1980) and *Anderson v. State,* 282 Md. 701, 387 A.2d 281 (1978). In the present case, however, it is not necessary for us to again delve deeply into the intricacies of the *Terry* opinion, for the conduct of the petitioner and his companion here is so similar to the suspicious conduct involved in the *Terry* case that we believe that opinion is clearly

---

1. At this point, we observe, as we did in Watkins v. State, 288 Md. 597, 602, 420 A.2d 270, 272-73 (1980), that "[t]hough the *Terry* court did not specifically rule on the constitutional propriety of an investigative seizure, Terry v. Ohio, supra, 392 U.S. at 19 n.16, *but see id.* at 32-33 (J. Harlan's concurring opinion), decisions subsequent to *Terry* have left no doubt as to the constitutionality of such detentions, given proper circumstances." Since "the right to frisk in [*Terry*] depend[ed] upon the reasonableness of [the] forcible stop to investigate [the] suspected crime," *id.* at 33, we deem the factual milieu of *Terry* to be equally applicable to the detention aspect of the stop-and-frisk doctrine.

dispositive of Mosley's fourth amendment contention. In order that the reader may appreciate that the case now before us may accurately be characterized as *Terry* reincarnate, we set out Chief Justice Warren's chronicle for the Supreme Court of the events occurring in *Terry,* held in that opinion to be sufficient to authorize the police stop:

> At the hearing on the motion to suppress this evidence, Officer McFadden testified that while he was patrolling in plain clothes in downtown Cleveland at approximately 2:30 in the afternoon of October 31, 1963, his attention was attracted by two men . . . standing on the corner of Huron Road and Euclid Avenue. . . .

> His interest aroused, Officer McFadden took up a post of observation in the entrance to a store 300 to 400 feet away from the two men. . . . He saw one of the men leave the other one and walk southwest on Huron Road, past some stores. The man paused for a moment and looked in a store window, and walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. Then the second man went through the same series of motions, strolling down Huron Road, looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual alternately between five and six times a piece — in all roughly a dozen trips. At one point, while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation. This man then left the two others and walked west on Euclid Avenue. [The two] resumed their measured pacing, peering, and conferring. After this had gone on for ten to twelve minutes, the two men walked off together, heading west on

Euclid Avenue, following the path taken earlier by the third man.

By this time Officer McFadden had become thoroughly suspicious. . . . Deciding that the situation was ripe for direct action, Officer McFadden approached the three men, identified himself as a police officer and asked for their names. At this point his knowledge was confined to what he had observed. He was not acquainted with any of the three men by name or by sight, and he had received no information concerning them from any other source. [*Terry v. Ohio, supra* at 5-7.]

In our view, the patent parallelism between the conduct in question in *Terry* and that before us in this case compels the conclusion that Corporal Wortman, by the time of the stop, possessed specific and articulable facts that would warrant a person of reasonable caution in the belief that criminal activity was afoot, thus authorizing a limited intrusion into petitioner's personal security. Mosley, while conceding in general the factual similarity between these two cases, nevertheless, retorts that here there are two factors not present in *Terry* which distinguish this case and compel a different result: (i) that the evidence here demonstrates that petitioner and his companion were leaving the shopping center when they were stopped by the police, and that therefore whatever exigencies which might have justified a *Terry* stop evaporated before Corporal Wortman detained the suspects; and (ii) that since a stop of a moving automobile is more intrusive than the halting of an individual on foot, the investigative stop of petitioner in this case did not comply with the standard enunciated in *Terry*.

As for Mosley's first contention, we initially note that the evidence is ambiguous as to whether he and his companion were in the process of leaving the shopping center. Corporal Wortman testified at the suppression hearing that, while parked, the Mosley vehicle was facing an entrance-exit to the shopping center and that, upon entering the vehicle, the two men "turned around and slowly started riding back

down the shopping center in a kind of slow manner." From this, in our view, it is quite possible to infer, and indeed seems likely, that the automobile was being driven away from the exit, rather than, as petitioner now on appeal argues, away from the store on which Mosley's attention was centered.[2] However, aside from the existence of this possible ambiguity, we note that *Terry* in this detail is instructively analogous, since, in that case Officer McFadden did not stop the suspects he was observing until after they had walked some distance down Euclid Avenue away from the Huron Road store to which the suspects' activity had earlier been directed. *Terry v. Ohio, supra* at 6. In its opinion, the Supreme Court did not articulate a significance to this movement away from the store, thus awarding it minimal import in reaching its conclusion that Officer McFadden did not violate Terry's fourth amendment constitutional rights. With regard to this point, we mention we do agree with petitioner that a suspect leaving the area in which his activity took place may, in some circumstances, justify a trier of fact concluding that this action diluted otherwise reasonable suspicion to such an extent that there remained only a hunch and not a suspicion that was reasonable in the constitutional sense. However, we are unable to say that the character of the movement here, unaccompanied as it is by any other factor legitimizing the behavior, rendered Corporal Wortman's investigative detention constitutionally improper so as to violate Mosley's fourth amendment rights. *See United States v. Holland,* 510 F.2d 453, 455 (9th Cir.), *cert. denied,* 422 U.S. 1010 (1975). We also do not agree with petitioner's other argument in this regard. First, we point out that it is now well established that the detention of persons riding in an automobile, based on facts insufficient to constitute probable cause to arrest,

---

2. Whereas the trial judge made no specific evaluation of the officer's testimony with respect to whether the suspect's vehicle was in the process of leaving the shopping center parking lot, he did definitively determine that the officer's description of the events preceding the arrests was the true version of what occurred. Since this factual determination is not clearly erroneous, we relate in the text only the testimony of Officer Wortman in regard to the matter.

does not violate their fourth amendment rights where the investigating officer's observations lead him reasonably to suspect that persons within the automobile have been, or are about to be, engaged in criminal conduct. *United States v. Cortez,* U.S., 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 628 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); *see also Delaware v. Prouse,* 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976); *Adams v. Williams,* 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). The Supreme Court has recently rearticulated the proper analysis to be utilized in assessing the reasonableness of investigative detentions:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining.... But the essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account.... The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of law breakers.... The process does not deal with hard certainties, but with probabilities.... The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaging in wrongdoing. [*United States v. Cortez, supra,* 101 S. Ct. at 695-96, 66 L. Ed. 2d at 628-29.]

While we are inclined to agree that in certain circumstances the stop of a moving vehicle may be more intrusive into a person's right of privacy than a brief detention of an individual on foot, we do not believe that petitioner here insulated himself from the otherwise legitimate and reasonable police investigation by merely entering and operating his motor vehicle. In short, our review of the record leaves us with the firm conviction that the conduct of the petitioner and his companion, both before and after entering the vehicle, viewed as part of "the whole picture," authorized the trial court to conclude, as it did, that "the facts available to the officer at the moment of the seizure ... [would] 'warrant a man of reasonable caution in the belief' that the [police] action taken was appropriate." *Terry v. Ohio, supra* at 21-22 (citations omitted). *Accord, Watkins v. State, supra* at 609-10, 420 A.2d at 277.

Petitioner's remaining contention, in his effort to obtain reversal of his conviction, is that the seizure of the brief case from the automobile during the investigative detention was in violation of the warrant requirement of the fourth amendment to the United States Constitution. To this, the State responds that, since, by his words, Mosley unconditionally consented to the seizure and search of the brief case and its contents, the police officer's action did not violate the suspect's constitutional rights. We agree. According to Corporal Wortman's testimony, he "advised the driver ... that [he would] like to look in his vehicle as [he] had observed ... a large leather bag that reminded [him] of a pocket book and since there was no woman in the car [he] asked him if [he] could look at it." Although petitioner testified to the contrary, the trial court found as a fact that Mosley then stated that he "didn't care if [Wortman] looked at it," and from these words, further concluded that the consent to search authorized an examination of those items contained within the brief case. It is now axiomatic that a search conducted pursuant to valid consent is constitutionally unassailable if the State meets its burden of establishing that the authority was voluntarily given and did not result from coercion or duress. *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *see also State v. Wilson,* 279 Md. 189, 201-02, 367 A.2d 1223, 1231 (1977); *Mathis v. Warden,* 243 Md. 682, 683, 221 A.2d 81, 82 (1966); *Hopkins and Terry v. State,* 239 Md. 517, 520, 211 A.2d 831, 833 (1965). Having reviewed the record, and the evidence adduced on the motion to suppress, we are unable to say, from the totality of the circumstances, the trial court was clearly erroneous in its factual determination that the scope of the consent tendered by Mosley was general, so as to cover those items within the brief case. *See, e.g., State v. Koucoules,* 343 A.2d 860 (Me. 1974) ("search for anything you want . . ." determined to be general consent, encompassing no spatial limitations); *Lamb v. State,* 89 Nev. 570, 516 P.2d 1405 (1973) (permission to "look around inside the house" constitutes general consent to search entire house). Further we conclude from our independent review of the entire record, *State v. Wilson, supra,* that the trial court was correct in its determination that the consent given was not the byproduct of coercion or duress, direct or implied. *Anderson v. State,* 237 Md. 45, 205 A.2d 281 (1964); *Armwood v. State,* 229 Md. 565, 185 A.2d 357 (1962).

Finding no error, we affirm the judgments.

> *Judgment of the Court of Special Appeals affirmed.*
> *Costs to be paid by petitioner.*

*Cole, J., dissenting:*

Whatever suspicion the police had was completely dissipated when the defendants entered their car and began to leave the scene. I, therefore, conclude that the police had no right to stop the defendants. It further seems to me that the Court engages in speculation in its effort to make the facts analogous with those of *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Once the stop is found to be unlawful, all the evidence which flowed therefrom is inadmissible. I respectfully dissent.