920 A.2d 1080

**Lamont Anthony LEWIS**

v.

**STATE of Maryland.**

**No. 95, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 12, 2007.

**352**

Claudia A. Cortese, Assistant Public Defender, (Nancy S. Forster, Public Defender, on brief), Baltimore, MD, for Appellant.

Steven L. Holcomb, Assistant Attorney General, (Douglas F. Gansler, Attorney General of Maryland, on brief), Baltimore, MD, for Appellee.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and LAWRENCE F. RODOWSKY and ALAN M. WILNER (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

Petitioner, Lamont Anthony Lewis, seeks review of the denial of his motion to suppress the seizure of marijuana discovered during a traffic stop after Lewis "almost" struck a police car. We hold that the court erred in denying Lewis's motion because the police did not have an articulable reasonable suspicion to stop Lewis based upon the fact that he "almost" hit the car.

## I. Introduction

On April 27, 2005,[1] at approximately 10:45 p.m., Sergeant Jeffery Jocuns, Detective Anthony Vaith, and Officer Tisha Anderson[2] of the Baltimore City Police Department were in a marked police cruiser near the intersection of Oswego Avenue and Park Heights Avenue in Baltimore City, an area described as an "open air drug market," and "known for violent crime and drug distribution activity." Sergeant Jocuns accompanied Detective Vaith and Officer Campbell while they were looking for a rape suspect described in a "flyer."

Detective Vaith, the driver, and Sergeant Jocuns, the passenger in the front seat, observed a tan sports utility vehicle parked on the side of the road, which was occupied by two individuals: a man in the driver's seat, later identified as Lewis, and a woman in the front passenger's seat, subsequently identified as Ms. Parksdale. According to the officers, Lewis and Ms. Parksdale started acting nervously, abruptly pushing their hands down under the vehicle's console. Sergeant Jocuns testified that he immediately thought about the flyer and was concerned that a rape could be in progress. According to Sergeant Jocuns, the officers then proceeded past Lewis's vehicle, and stopped the police cruiser "in the street . . . not at the curb," "a little bit in front of the SUV."

---

1. All of the facts, as herein set forth, were developed at the suppression hearing.

2. Officer Anderson remained inside the police cruiser during the entire incident and did not testify during the suppression hearing.

**354**

Detective Vaith, the driver, recounted the events that transpired thereafter:

[W]e pulled down a little bit farther. I didn't want to stop the vehicle directly next to the defendant's vehicle because I didn't know if there was a weapon and I didn't want to put myself or anyone else in the vehicle in harms way. So I pulled down. At that point the defendant activated his turn signal and started to pull out into the street nearly striking the back of my vehicle. That was—at that point that's when Sergeant Jocuns said "[H]e almost hit your vehicle what's this guy doing?" So I pulled to the side and parked and got out as well as Sergeant Jocuns. We both approached the vehicle. Sergeant Jocuns advised that he observed the defendant still making movements in the console area. At that point for officer safety Sergeant Jocuns requested the defendant to exit the vehicle. When he did so a cell phone and a plastic bag fell to the ground. My attention was diverted at that point. Because at that point the vehicle was not placed in gear and it started to drift down the street. I ran and jumped in the vehicle. Put the brakes on it. Put the car in park. Sergeant Jocuns was dealing with the defendant at that point. I walked around the other side of the vehicle and requested that the passenger exit the vehicle. And then that's when I was notified by Sergeant Jocuns that there was marijuana in the vehicle— or it came out of the vehicle when the driver exited.

\* \* \*

I went back to the vehicle to see if there was anything in the general area that I observed the defendant making movements at, which was a console area. And there was between the passenger side seat and the center console was a marijuana cigarette. I recovered that. There was no other items found in the vehicle. When I returned back to the area where the defendant—Ms. Parksdale was I began to explain the situation that there was marijuana found falling from the defendant as he exited the vehicle. And then there was marijuana found in the passenger side of the

vehicle. And that's when the defendant had said everything in the vehicle was his. She didn't have anything to do with it. And explained on several occasions that it was all his.

This testimony, thus, reflects that after seeing the two individuals in a car parked on Oswego Avenue, the officers drove the police cruiser slowly by Lewis's SUV and stopped the police cruiser while in the street just in front of the SUV. At that point, Lewis activated his left turn signal and started to pull his vehicle into the street, almost striking the back of the police cruiser. Lewis thereupon stopped his vehicle, and Detective Vaith pulled to the side of the street and parked the police cruiser fifteen to twenty feet in front of the SUV. Detective Vaith and Sergeant Jocuns both got out, and Sergeant Jocuns requested that Lewis get out of the vehicle after he and the Detective observed more movements in the console area. When Lewis stepped out, a plastic bag containing marijuana fell to the ground, and the SUV, driverless, drifted approximately twenty feet down Oswego Avenue.

Lewis was subsequently charged with possession of a controlled dangerous substance, marijuana, in violation of Section 5–601(c)(2) of the Criminal Law Article.[3] Prior to trial, Lewis

---

**3.** Section 5–601 states in pertinent part:

(a) In general.—Except as otherwise provided in this title, a person may not:
(1) possess or administer to another a controlled dangerous substance, unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice; or
(2) obtain or attempt to obtain a controlled dangerous substance, or procure or attempt to procure the administration of a controlled dangerous substance by:
(i) fraud, deceit, misrepresentation, or subterfuge;
(ii) the counterfeiting or alteration of a prescription or a written order;
(iii) the concealment of a material fact;
(iv) the use of a false name or address;
(v) falsely assuming the title of or representing to be a manufacturer, distributor, or authorized provider; or
(vi) making, issuing, or presenting a false or counterfeit prescription or written order.

* * *

filed a motion to suppress the marijuana that was seized from him, as well as the subsequent statements. During the hearing on the motion, only Sergeant Jocuns and Detective Vaith testified. Following this testimony, the State argued that the incident with Lewis was equivalent to an investigatory traffic stop because the officers had the right to stop Lewis when his SUV "almost" hit the police cruiser when Lewis pulled away from the curb. The State also asserted that it was appropriate for officer safety for Sergeant Jocuns to ask Lewis to get out of the SUV. Additionally, the State postured that the plastic bag of marijuana provided the officers with probable cause to arrest Lewis and, therefore, the subsequent search of his vehicle qualified as a search incident to an arrest.

Conversely, Lewis's counsel argued that the fact that Lewis put on his turn signal, looked at the officers, and then pulled into the street "almost" hitting the police car did not provide reasonable articulable suspicion to effectuate a stop because there was no traffic infraction. His counsel also asserted that Lewis was not issued any traffic citation, reflecting that he broke no law.

At the conclusion of the suppression hearing, the Judge granted the suppression motion as to the evidence of the discarded marijuana cigarette and Lewis's statements of ownership,[4] but denied the motion as to the plastic bag of marijuana that fell from the vehicle when Lewis got out of the SUV; the judge, in so doing, ruled that the officers had a reasonable suspicion to stop Lewis because he "almost" hit the police car:

---

(c)(1) Penalty.—Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 4 years or a fine not exceeding $25,000 or both.

(2) A person whose violation of this section involves the use or possession of marijuana is subject to imprisonment not exceeding 1 year or a fine not exceeding $1,000 or both.

Maryland Code (2002), Section 5–601 of the Criminal Law Article.

4. The State did not raise, by way of cross-appeal, whether the suppression court erred when it granted the motion to suppress with regard to the marijuana cigarette or Lewis's statements of ownership. Therefore, we do not address these issues.

I find from the evidence that the police officers were cruising in northwest Baltimore in the vicinity of Park Heights Avenue and Oswego Avenue. When they made a turn into Oswego and saw a vehicle being operated by the defendant, which was stopped or parked. And they saw some hand motions, which gave them some suspicion. I won't call it reasonable suspicion. I'll call it a hunch. There was utterly no evidence whatsoever or no reason to think there was any possible attempted rape going on. And, but for one fact I would rule that the police officer had no right to ask the defendant to come out of the car. However, once the car moved forward, which it had a right to do and according to—well, I'm going to Officer Vaith—he said—one of them said what's wrong with this guy, what's he up to. Almost hitting the police car. Saying what's this guy doing. It was Officer Vaith's testimony. They had a right to investigate for purposes of a traffic stop. Now, before then I would say they did not have articulable suspicion based on same hand movement. The most troubling part for is does he have a right to ask the defendant to get out of the car. Okay. A high crime area. We know that some people do have weapons. They do have guns. We know that police officers have been killed made traffic stops by people who had guns. I don't remember the year, but there was a State Trooper, his I believe was Wolf, I think recently the defendant or one of the defendant's in this case was denied post-conviction relief. Not to the fact that case has anything to do with this other than would it be appropriate for officer safety to ask him to get out of the car? I say, yes. Now, but with the fact that according to the testimony the marijuana just rolled out—it just fell out at that point in time. Asking him to get out for the investigative purpose in my view at that juncture was not a seizure. When the drugs rolled out there was reason to believe that a crime had been committed. Possession of a controlled dangerous substance, marijuana. Cause the reason I stated I'm not granting the motion to suppress that marijuana.

Lewis was subsequently convicted of possession of a controlled dangerous substance, marijuana, and sentenced to one year imprisonment. Lewis noted an appeal to the Court of Special Appeals, and subsequently this Court issued, on its own initiative, a writ of certiorari prior to any proceedings in the intermediate appellate court. *Lewis v. State,* 396 Md. 11, 912 A.2d 647 (2006). Lewis's brief presents the following issue:

Did the trial court err in denying Appellant's .motion to suppress the marijuana?

We hold that the trial court erred in denying Lewis's motion to suppress the marijuana because the police did not have justification to conduct the investigatory traffic stop based upon the fact that Lewis "almost" hit the police car.

## II. Standard of Review

When reviewing the denial of a motion to suppress evidence, we ordinarily consider only the information contained in the record of the suppression hearing, and not the trial record. *Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785, 791 (2005); *State v. Nieves,* 383 Md. 573, 581, 861 A.2d 62, 67 (2004); *Laney v. State,* 379 Md. 522, 533, 842 A.2d 773, 779 (2004); *State v. Green,* 375 Md. 595, 607, 826 A.2d 486, 493 (2003); *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003); *Carter v. State,* 367 Md. 447, 457, 788 A.2d 646, 651 (2002). Further, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the prevailing party on the motion. *Whiting,* 389 Md. at 345, 885 A.2d at 791; *Nieves,* 383 Md. at 581, 861 A.2d at 67; *Laney,* 379 Md. at 533, 842 A.2d at 779; *Green,* 375 Md. at 607, 826 A.2d at 493; *Rucker,* 374 Md. at 207, 821 A.2d at 444; *Carter,* 367 Md. at 457, 788 A.2d at 651. "Although we extend great deference to the hearing judge's findings of fact, we review, independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed." *Whiting,* 389 Md. at 345, 885 A.2d at 791; *Nieves,* 383 Md. at 581–82, 861 A.2d at 67; *Laney,* 379 Md. at 533–34, 842 A.2d at 779–80;

*Rucker,* 374 Md. at 207, 821 A.2d at 444; *Carter,* 367 Md. at 457, 788 A.2d at 651.

## III. Discussion

 Lewis contends that the trial court erred in denying his motion to suppress the marijuana discovered when the plastic bag containing such fell from his lap while he was getting out of his car. Lewis argues that a seizure occurred when the police stopped their cruiser and asked him to get out of his SUV, because he was prevented from driving away by the police's presence, and that such seizure was unreasonable under the Fourth Amendment; Lewis maintain that, even if he "almost" hit the police car, he did not violate any law, and therefore his actions did not provide the police with a reasonable suspicion that he was operating his vehicle unlawfully. Additionally, Lewis suggests that a "community caretaking function" justification for conducting an investigatory traffic stop is not recognized under Maryland law, and even if it were, was not applicable in this case because the police were acting within their investigative function.

The State, conversely, argues that the trial court did not err in denying Lewis's motion to suppress the marijuana contained in the plastic bag. The State primarily argues that the police had justification to stop Lewis and conduct an investigatory traffic stop because they had a reasonable suspicion to believe that Lewis was operating his vehicle unlawfully, pointing to the fact that Lewis almost hit the police cruiser when pulling into Oswego Avenue. This "almost" accident, according to the State, afforded the officers the right to conduct an investigatory traffic stop for the purpose of determining whether Lewis was negligently or recklessly driving in violation of Section 21–901.1 of the Transportation Article,[5] or

---

**5.** Section 21–901.1 states:
(a) *Reckless driving.*—A person is guilty of reckless driving if he drives a motor vehicle:
(1) In wanton or willful disregard for the safety of persons or property; or

driving under the influence in violation of Section 21–902 of the Transportation Article.[6] Further, the State opines that the officers, out of a concern for their own safety, had the right to request that Lewis get out of his vehicle. Alternatively, the State argues that the seizure was justified under the police's community caretaking function, articulated by the Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

The Fourth Amendment to the United States Constitution,[7] made applicable to the States by the Fourteenth Amendment,

---

(2) In a manner that indicates a wanton or willful disregard for the safety of persons or property.

(b) *Negligent driving.*—A person is guilty of negligent driving if he drives a motor vehicle in a careless or imprudent manner that endangers any property or the life or person of any individual. Maryland Code (1977, 2006 Repl.Vol.), Section 21–901.1 of the Transportation Article.

6. Section 21–902 provides in pertinent part:
(a)(1) A person may not drive or attempt to drive any vehicle while under the influence of alcohol.
(2) A person may not drive or attempt to drive any vehicle while the person is under the influence of alcohol per se.
\* \* \*
(b)(1) A person may not drive or attempt to drive any vehicle while impaired by alcohol.
\* \* \*
(c)(1) A person may not drive or attempt to drive any vehicle while he is so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that he cannot drive a vehicle safely.
\* \* \*
(d)(1) A person may not drive or attempt to drive any vehicle while the person is impaired by any controlled dangerous substance, as that term is defined in § 5–101 of the Criminal Law Article, if the person is not entitled to use the controlled dangerous substance under the laws of this State.
Maryland Code (1977, 2006 Repl.Vol.), Section 21–902 of the Transportation Article.

7. The Fourth Amendment to the United States Constitution provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

protects against unreasonable searches and seizures. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996); *United States v. Mendenhall*, 446 U.S. 544, 550, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497, 507 (1980); *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 898 (1968). The Supreme Court has iterated that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren*, 517 U.S. at 809–10, 116 S.Ct. at 1772, 135 L.Ed.2d at 95.

The Fourth Amendment, however, is not "a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985) (emphasis added). Therefore, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security'". *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 335 (1977), quoting *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904. In assessing the reasonableness of a traffic stop, the Supreme Court has adopted a "dual inquiry," examining "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682, 105 S.Ct. at 1573, 84 L.Ed.2d at 613, quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. The case *sub judice* concerns the first inquiry—whether the police had justification to stop Lewis.

A traffic stop is justified under the Fourth Amendment where the police have a reasonable suspicion supported by articulable facts that criminal activity is afoot. *Whren*, 517 U.S. at 812–13, 116 S.Ct. at 1774, 135 L.Ed.2d at 97–98; *Myers v. State*, 395 Md. 261, 281, 909 A.2d 1048, 1060 (2006);

U.S. Const., Amend. IV.

*Cartnail,* 359 Md. at 284–85, 753 A.2d at 526. Thus, a traffic stop violates the Fourth Amendment where there is no

> reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws.

*Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 1394, 59 L.Ed.2d 660, 665 (1979); *Rowe v. State,* 363 Md. 424, 433, 769 A.2d 879, 884 (2001).

We have recognized that the reasonable suspicion standard requires the police to possess "a particularized and objective basis" for suspecting legal wrongdoing. *Myers,* 395 Md. at 281, 909 A.2d at 1060; *Nathan v. State,* 370 Md. 648, 660, 805 A.2d 1086, 1093 (2002); *Stokes v. State,* 362 Md. 407, 415, 765 A.2d 612, 616 (2001), quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). *See Cartnail v. State,* 359 Md. at 287, 753 A.2d at 527 (requiring more than an " 'inchoate and unparticularized suspicion or hunch' "), quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989). In assessing whether the articulable reasonable suspicion standard is satisfied, this Court has adopted the "LaFave factors":

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) *observed activity by the particular person stopped;* and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

*Cartnail,* 359 Md. at 289, 753 A.2d at 528 (emphasis added), quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.). *See also Myers,* 395 Md. at 281, 909 A.2d at 1060; *Stokes,* 362 Md. at 420, 765 A.2d at 619.

Clearly, under the observed activity factor, the police have the right to stop and detain the operator of a vehicle when they witness a violation of a traffic law. *See, e.g., Byndloss v. State,* 391 Md. 462, 481, 893 A.2d 1119, 1130–31 (2006) ("Sergeant Hughes conducted a lawful stop of Ms. Malone's green Chevrolet Malibu, in which petitioner was the front seat passenger, after observing that the car's license plate was obscured by a plastic license plate cover [in violation of Section 13–411 of the Transportation Article]."); *Green,* 375 Md. at 614, 826 A.2d at 497 ("In the case *sub judice,* like in *Ferris,* the parties do not dispute that Deputy Meil stopped Green because he had probable cause to believe he had violated the law by exceeding the posted speed limit."); *State v. Wallace,* 372 Md. 137, 141, 145, 812 A.2d 291, 294, 296 (2002) (stating that it was agreed that stop was justified after officer witnessed vehicle exceed speed limit and run a red light); *Nathan,* 370 Md. at 661, 805 A.2d at 1094 (determining that stop was justified after officer witnessed vehicle speeding on a public highway); *Wilkes v. State,* 364 Md. 554, 572, 774 A.2d 420, 431 (2001) (finding that stop was justified for vehicle exceeding the posted speed limit); *Ferris,* 355 Md. at 369, 735 A.2d at 498 ("It is without dispute that the stop of Ferris by Trooper Smith for exceeding the posted speed limit constituted a seizure for Fourth Amendment purposes, but that such a seizure was justified by the probable cause possessed by the trooper in having witnessed Ferris's traffic violation."); *Derricott v. State,* 327 Md. 582, 584, 611 A.2d 592, 594 (1992) (stop justified when officer witnessed vehicle traveling 89 miles per hour in 55 miles per hour zone). *See also Myers,* 395 Md. at 277 n. 7, 909 A.2d at 1057–58 n. 7 (stating in dicta that a police officer's "mental impression of [a vehicle's] speed, under the circumstances, might have been adequate probable cause or, at a minimum, reasonable suspicion that [the vehicle] was traveling in excess of the posted speed" to justify a traffic stop); *Stokes,* 362 Md. at 426–27, 765 A.2d at 622–23 (remarking in dicta that speeding into a parking lot and parking diagonally across several spots would provide a reasonable

articulable suspicion to officers that driver was violating traffic laws).

■ Conversely, mere hunches that unlawful activity is afoot do not support a traffic stop. *Prouse*, 440 U.S. at 648, 99 S.Ct. at 1391, 59 L.Ed.2d at 660. In *Prouse*, the reasonableness of discretionary spot checks of operator licenses and vehicle registrations was in issue. In rejecting the use of entirely discretionary spot checks, the Court remarked that the "foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed violations," and that "[t]o insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial that inarticulate hunches' ". *Id.* at 659, 661, 99 S.Ct. at 1399, 1400, 59 L.Ed.2d at 671, 672. Further, Justice Byron White, writing for the Court, stated:

> By hypothesis, stopping apparently safe drivers is necessary only because the danger presented by some drivers is not observable at the time of the stop. When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicenced [unlicensed] or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

*Id.* at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672.

We also had the opportunity to address the unreasonableness of a traffic stop based upon mere hunches in *Cartnail v. State*, 359 Md. at 272, 753 A.2d at 519, in which the police

stopped a vehicle lawfully driven by Cartnail based upon a suspicion that he and his passenger were involved in a robbery; the police subsequently discovered that Cartnail's driver's license had been revoked. Cartnail challenged the validity of the traffic stop, and we agreed, holding that the suppression hearing record "fails to establish that a reasonable and prudent police officer would have reasonable suspicion to stop Petitioner and, therefore, the stop was constitutionally illegal under the Fourth Amendment." *Id.* at 289, 753 A.2d at 528–29. In reaching our conclusion, we applied the LaFave factors, noting that Cartnail "was not engaged in any suspicious activity, that there was no reason to believe that [Cartnail] was involved in another criminal case, and that he appeared to be operating his vehicle in compliance with the apparent rules of the road." *Id.* at 290, 753 A.2d at 529. Further, we explained that lawfully operating a vehicle was an "innocent activity," which could only raise an articulable reasonable suspicion that criminal activity was afoot when coupled with suspicious circumstances:

> Here, a reasonable police officer had only facially innocent activity to generate reasonable suspicion because no suspicious activity had been personally observed. In *Ferris*, we considered the issue of innocent activity and when it can lead to a reasonable articulable suspicion if placed in proper context. We observed that the Supreme Court, in *Reid v. Georgia*, [448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)], explained that "factual circumstances which 'describe a very large category of presumably innocent travelers' cannot, in and of themselves, justify a seizure." We contrasted *Reid* against *Sokolow* where the Court explained that a series of acts which could appear naturally innocent if viewed separately may collectively warrant further investigation by grounds of reasonable suspicion. *Ferris* reconciled the two parallel decisions by adopting the reasoning of *Karnes v. Skrutski*, [62 F.3d 485 (C.A.3, 1995)]:
>
>> The Third Circuit reasoned that, although the factors relied upon in *Sokolow* to find reasonable suspicion were consistent with innocent travel, they were nonetheless

" 'out of the ordinary.' " *Karnes* emphasized the distinction between individual factors which are consistent with innocent travel, but nonetheless out of the ordinary, and individual factors which are both consistent with innocent travel and too commonplace to be probative in tending to show criminal activity. The Third Circuit's decision in *Karnes* also recognized that the reasonable suspicion standard, as applied to the totality of the circumstances, must be narrow enough to eliminate a great number of objectively innocent individuals:

> *Reid and Sokolow*, [490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (U.S.Hawai'i, 1989)], taken together, demonstrate it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.

\* \* \*

Furthermore, "[a]lthough the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.' "

\* \* \*

The record clearly shows that Petitioner gave no indication he was engaged in criminal activity, nor did he commit a moving traffic violation, that would have triggered immediate police reaction. For as much as the suppression hearing record reveals, Petitioner's vehicle evidenced no outward violations of motor vehicle laws, such as a malfunctioning light, missing license plate, or the like. We note that despite the fact that there are usually less people in public during the early morning hours, a driver is still entitled to

privacy at any time of the day and should not be disturbed by the police without constitutional authority.

*Cartnail,* 359 Md. at 290–91, 294, 296, 753 A.2d at 529–30, 531, 532 (citations omitted).

We have upheld investigatory traffic stops of vehicles being operated lawfully, however, when lawfulness was accompanied by suspicious behavior or information regarding criminal activity. In *Mosley v. State,* 289 Md. 571, 425 A.2d 1039 (1981), the police observed two young men, one of them later identified as Mosley, standing outside of a department store, pacing back and forth, glaring through the window in the direction of the store's cash registers, and alternately entering the store several times, walking around the cash registers, and then venturing outside. The men subsequently walked to their vehicle and proceeded slowly down the shopping center parking lot in their car. The police stopped the vehicle and subsequently discovered evidence linking the men to an armed robbery. Mosley challenged the legality of the stop; we found that Mosley's, and his companion's, conduct was "so similar to the suspicious conduct involved in the *Terry* case that we believe that opinion is clearly dispositive of Mosley's fourth amendment contention," and that their actions outside of the department store provided the police with "specific and articulable facts that would warrant a person of reasonable caution in the belief that criminal activity was afoot." *Id.* at 574, 575, 576, 425 A.2d at 1041, 1042.

"Almost" committing a traffic violation, however, does not justify a traffic stop. In *Rowe,* 363 Md. at 439, 769 A.2d at 888, a state trooper witnessed a vehicle traveling south on Interstate 95 at a speed less than the 65 miles per hour speed limit; the vehicle also crossed the white shoulder line onto the rumble strip and swerved back into the lane, only to subsequently return and touch the shoulder line again. The trooper stopped the car for failing to drive in a single line in violation of Section 21–309 of the Transportation Article.[8] In consider-

---

8. Section 21–309(b) of the Transportation Article, as applied in *Rowe,* stated in pertinent part:

ing whether Rowe's operation of his vehicle was unlawful, we noted that Section 21–309 does not render conduct not endangering other vehicles or individuals unlawful, so that Rowe's conduct did not constitute an infraction, and his "almost" violation could not alone justify the stop:

> The cases in which courts have upheld traffic stops based on violation of statues [statutes] similar to § 21–309 involve conduct much more egregious than that in which the petitioner engaged in this case. . . .

\* \* \*

· We conclude that the petitioner's momentary crossing of the edge line of the roadway and later touching of that line *did not amount to an unsafe lane change or unsafe entry onto the roadway, conduct prohibited by § 21–309, and, thus, cannot support the traffic stop in this case.*

*Id.* at 439, 441, 769 A.2d at 888, 889 (emphasis added).

 What the State in the present case attempts to do, however, is "skirt" hunch, cruise past "almost" unlawful, and arrive at "almost" accident to permit investigatory traffic stops in situations in which a driver of a car is "almost" involved in a traffic accident. The State's attempt to do so runs afoul of Fourth Amendment jurisprudence because there is no basis for conducting an investigatory traffic stop when it is evident that the driver is lawfully operating his vehicle without any accompanying illegal activity. The State's proposed principle would permit the police to exercise unrestrained discretion when deciding to make a traffic stop, based upon a belief that the driver has "almost" been involved in a traffic accident. Such a standardless chimera practically destroys the objective basis of the reasonable suspicion require-

---

A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.

Maryland Code (1977, 1999 Repl.Vol.), Section 21–309(b) of the Transportation Article.

ment.[9] Almost causing an accident could include driving less than the speed limit, passing another car appropriately or merely parallel parking.

In the present case, Lewis was stopped on the road and pulled into the street, activating his left turn signal. That he "almost" hit the police car did not constitute a traffic infraction nor illegal activity.

A number of our sister states have reached a similar conclusion, not permitting investigatory traffic stops amidst an alleged "almost" accident, absent a violation of the law. In *State v. Smith*, 21 S.W.3d 251 (Tenn.Crim.App.1999), the police effectuated a traffic stop after a vehicle changed lanes to pass another vehicle, without signaling. In assessing the reasonableness of the traffic stop, the court remarked that such passing, when done when there is minimal traffic on the road, "is [not] an unusual occurrence," and that making a lawful lane change could not give an officer "reasonable suspicion to believe that an [individual] is either drunk or tired" or that the individual is unlawfully operating the vehicle:

> Similarly, Trooper Norrod did not have reasonable suspicion to believe that the Defendant was involved in or about to be involved in criminal activity, which would have also justified the seizure. He apparently suggested to the Defendant that he thought the Defendant might have been drunk or tired, but he insisted in the suppression hearing that the only reason he stopped the Defendant was because of an "improper" lane change. As already noted, the Defendant did not violate any traffic provision by changing lanes without signaling. Making a "lawful" lane change, which we equate somewhat to a "proper" lane change, as described herein, could not give any officer reasonable suspicion to believe that an individual is either drunk or tired.

---

**9.** An officer may, of course, initiate a stop upon observation of reckless or negligent driving that almost causes an accident, but the stop, in such case, is for reckless or negligent driving, not "almost" causing an accident. Neither officer ever suggested reckless or negligent driving as the basis for the stop.

* * *

There was no evidence that the Defendant was driving erratically, weaving, or otherwise causing a hazard to other vehicles.... *We are reluctant to conclude that a person driving in a manner that an officer deems "improper," when the driving is not erratic or haphazard and does not create a dangerous situation, is subject to seizure while proceeding along a highway in a lawful manner.*

*Id.* at 257, 258 (emphasis added). *See State v. Brew,* 593 So.2d 447, 451 (La.Ct.App.1992) (remarking that traffic stop was justified after officer witnessed traffic violation, and the fact that violation "almost caused an accident" did not have any bearing on whether the stop was justified); *Whitson v. Dep't of Pub. Safety,* 346 N.W.2d 454, 456 (S.D.1984) (stating that the stop was justified for committing a traffic violation by carelessly cutting in front of other vehicles approaching an intersection, which only incidently "almost" caused an accident).

In another attempt at justification, the State also contends that the police appropriately stopped Lewis in order to foil an attempted rape, pursuant to their community caretaking function, postulated by the Supreme Court in *Cady v. Dombrowski,* 413 U.S. at 433, 93 S.Ct. at 2523, 37 L.Ed.2d at 706. In *Cady,* the Court addressed the reasonableness of a warrantless search of the trunk of an impounded vehicle, and held that the search was not unreasonable under the Fourth Amendment because the police, in searching the trunk, were not collecting evidence, but were acting out of "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447–48, 93 S.Ct. at 2531, 37 L.Ed.2d at 718. In reaching its conclusion, the Court discussed the community caretaking function:

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involv-

ing automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

\* \* \*

Here the justification [for the search] ... was as immediate and constitutionally reasonable as those in *Harris* [*v. U.S.*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (U.S.Dist.Col., 1968)] and *Cooper* [*v. State of Cal.*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (U.S.Cal., 1967)]: concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle.

\* \* \*

The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking "search" conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable.... Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not "unreasonable" within the meaning of the Fourth and Fourteenth Amendments

*Id.* at 447–48, 93 S.Ct. at 2531, 37 L.Ed.2d at 714–15, 718.

The State, extolling the application of the logic utilized by the Supreme Court in *Cady,* points to *Stanberry v. State,* 343 Md. 720, 684 A.2d 823 (1996), and *Rowe,* 363 Md. at 424, 769 A.2d at 879, contending that we also have recognized a com-

munity caretaking justification for investigatory traffic stops. In *Stanberry*, the police conducted a drug interdiction investigation at a highway rest stop. During the investigation, the police, without first obtaining a warrant, searched a "suit bag" found on a luggage rack of a bus, after none of the bus's passengers claimed ownership of it, and discovered heroine and cocaine. We concluded that the warrantless search implicated the Fourth Amendment guarantees and was unreasonable. *Id.* at 739, 740, 684 A.2d at 832, 833. Moreover, although we recognized that the community caretaking function was not involved in the case, we articulated, in dicta, the distinction between the caretaking function and the investigatory role of the police:

> Moreover, although we find today that, under the circumstances presented in the instant case, the police search of Petitioner's luggage was unlawful, we stress that our holding is limited to the conduct of the police when they are acting in their criminal investigatory capacity.

> \* \* \*

> In essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress (caretaking function). Courts have noted that preservation of human life is paramount to the right of privacy protected by the fourth amendment. Thus, the [community caretaking function] is justified because the motivation for the intrusion is to preserve life rather than to search for evidence to be used in a criminal investigation.

> Our holding does not apply to situations in which the police are acting to protect public safety pursuant to their community caretaking function....

*Id.* at 742–43, 684 A.2d at 834 (citations omitted).

In *Rowe*, however, we rejected the community caretaking function as a justification for a traffic stop to ensure the safety of the occupant. After we determined that the traffic stop was not justified as an observed traffic violation, we noted:

Several states have recognized that, under the community caretaking function discussed in *Cady v. Dombrowski,* a police officer may stop a vehicle to ensure the safety of the occupant without a reasonable suspicion of criminal activity. Neither this Court nor the General Assembly has adopted the community caretaking function in this context, and the State has not urged us to do so in this case.

*Id.* at 442–43, 769 A.2d at 890.

Whether or not the community caretaking function h as been recognized b y this Court, in dicta or in a holding, it is not applicable in the present case. Although the State argues that the police had justification to conduct the traffic stop under the community caretaking function to protect the general public because the police were looking for a suspect wanted in connection with a rape, and to protect Ms. Parksdale because Sergeant Jocuns testified that he thought that a rape could be in progress, the suppression hearing judge totally rejected such factual findings in stating "there was utterly no evidence whatsoever or no reason to think there was any possible attempted rape going on." We agree.

In conclusion, the police did not have an articulable reasonable suspicion to stop Lewis based upon the fact that he "almost" struck a police car and so, we hold that the trial court erred in denying Lewis's motion to suppress the marijuana.

***JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.***

Dissenting Opinion by RODOWSKY, J., which RAKER and HARRELL, JJ., join.

RODOWSKY, J., dissent.

I respectfully dissent. In my opinion, the evidence was sufficient to permit the suppression court to find justification for the traffic stop because the misdemeanor of negligent driving was committed in the presence of the police officers.

The facts are critical, and the testimony must be taken in a light most favorable to the State, as the prevailing party on the suppression motion. Three officers were on routine patrol in a marked police cruiser at about 10:45 p.m. in the lower Park Heights area of Baltimore City. Detective Vaith was driving and Sergeant Jocuns was in the front passenger seat. The cruiser turned from Park Heights Avenue to proceed westbound on Oswego Avenue. Oswego Avenue is four lanes wide, with parking permitted in the lanes adjacent to the north and south curbs, leaving one lane for traffic westbound and one lane for eastbound traffic.

For reasons that are immaterial to this appeal, the police witnesses' attention was directed to an SUV parked at the north curb. Detective Vaith drove slowly past the SUV and the officers looked inside it at the driver, later determined to be the appellant, Lamont Anthony Lewis, and at a woman in the front passenger seat. Detective Vaith stopped the police cruiser in the westbound traffic lane, sufficiently beyond the SUV to take the police cruiser out of the direct line of fire by an occupant of the SUV, in the event that the situation turned bad.

Detective Vaith described what then occurred.

"At that point the defendant activated his turn signal and started to pull out into the street nearly striking the back of my vehicle. That was—at that point that's when Sergeant Jocuns said, '[H]e almost hit your vehicle[. W]hat's this guy doing?' So I pulled to the side and parked and got out as well as Sergeant Jocuns. We both approached the vehicle."

The unarticulated, but necessarily included, fact in this description is that Mr. Lewis stopped the SUV without any order by the police to stop. Detective Vaith's testimony that he and Sergeant Jocuns "approached" the SUV means that they approached it on foot. Consequently, the SUV remained stopped while Detective Vaith pulled from the second westbound lane and parked and while the officers alighted the cruiser. In other words, the SUV did not swing fully past the police cruiser in order to proceed westerly on Oswego.

When the officers approached the SUV, Mr. Lewis was ordered to step out of the vehicle. It was at that point that there was a police initiated traffic stop. Mr. Lewis got out of the driver's side, and his cell phone and the plastic bag of marijuana fell to the ground. Mr. Lewis apparently failed to secure the parking brake when he exited the SUV. It began to drift westerly on Oswego. Detective Vaith pursued on foot and was able to get into the SUV, stop it, and put the vehicle in park gear.

Mr. Lewis's operation of the SUV, as above described, falls within the prohibition of Maryland Code (1977, 2006 Repl. Vol.), § 21–901.1(b) of the Transportation Article (TR) which reads in relevant part:

"A person is guilty of negligent driving if he drives a motor vehicle in a careless or imprudent manner that endangers any property[.]"

The opinion of the Court in this case would have the reader conclude that the "almost" accident, above described, was no more than the successful navigation of the narrow clearances regularly encountered in traffic-congested, urban areas. The suppression court, as I believe it properly could do, focused on Detective Vaith's description of what Sergeant Jocuns said, *i.e.*, "[H]e almost hit your vehicle[. W]hat's this guy doing?" The testimony has the reliability indicia of an excited utterance. The suppression court saw and heard the witnesses, and was in a better position than is this Court to consider the volume and inflection of the voice in which the quoted testimony was given.[1]

Defense counsel also saw and heard the witnesses. Reviewing the evidence in argument to the court, defense counsel described the testimony as follows:

---

1. It is immaterial whether Mr. Lewis, to avoid the collision, either suddenly applied his brakes and stopped just short of the rear of the cruiser or whether he swerved at the last split-second and stopped with some part of the SUV beyond the rear of the cruiser. The point is that Mr. Lewis's driving was such that it provoked an excited utterance from Sergeant Jocuns.

"You have Officer Jocuns['s] testimony that he looked—that he saw the car *coming into*—saw Mr. Lewis's car *coming into* their car. You had Officer Vaith's testimony that Officer Jocuns looked back and saw Mr. Lewis almost *coming into* their car."

(Emphasis added). Defense counsel argued that little or no weight should be given to this evidence because Mr. Lewis activated his left turn signal before pulling away from the curb and because the police officers issued no traffic citations.

To this argument the court replied:

"There's no traffic citations. But, if somebody is in a car and they almost hit another or almost hit a police car that's not reason enough to make a further inquiry?"

"[Defense Counsel]: No, Your Honor."

"THE COURT: What are you supposed to do; ignore it?"

The majority bolsters its conclusion that, as a matter of law, the suppression court could not find a violation of TR § 21–901.1(b), by noting that "[n]either officer ever suggested reckless or negligent driving as the basis for the stop." Slip opinion at 22 n. 11. Of course, once the drugs hit the street, the officers had a more serious offense with which to be concerned. Apropos is *United States v. Atkinson,* 450 F.2d 835 (5th Cir.1971), where the court said:

"That the officer elected to charge Atkinson with the more serious of the two crimes involved does not prevent the validity of the arrest from resting on the lesser crime.... Any other rule would force police officers to routinely charge every citizen taken into custody with every offense they thought he could be held for in order to increase the chances that at least one charge would survive the test for probable cause. Such a clogging of the criminal process already heavily encumbered, would be pointless. We thus decide that there was probable cause to arrest for the improperly displayed license tag, and we look no further."

*Id.* at 838 (citations omitted).

In any event, the constitutionality of a search or seizure under the Fourth Amendment is to be determined by the

objective facts and is not limited to the legal theory which the police officer believed, even erroneously, justified the invasion. *See Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (sustaining, because of probable cause to believe arrestee was impersonating a police officer, warrantless arrest assertedly for violation of state privacy statute); *Lee v. State,* 311 Md. 642, 669, 537 A.2d 235, 248 (1988) ("Nor is a search incident analysis ... precluded by Officer Baughman's belief that his legal justification for opening the gym bag was a protective search for weapons."); *Marbury v. United States,* 540 A.2d 114, 115 (D.C.App.1985) (upholding traffic stop as supported by the evidence and findings by the trial court, although the arresting officer "stated that he had *not* pulled appellant's car over because of a traffic violation (driving without lights); and he made no mention of the traffic violation in any police department form."); 1 W.R. LaFave, *Search and Seizure* § 1.4(d) (2004).

Based on Sergeant Jocuns's excited exclamation, on the position of the vehicles when the SUV "almost" hit the police cruiser, and on Mr. Lewis's recognition that he should stop, rather than proceed westerly on Oswego, the suppression court could conclude that there was justification for the traffic stop. In the language of TR § 21–901.1(b), the suppression court could find that Mr. Lewis had driven the SUV "in a careless or imprudent manner that endanger[ed]" property.

I find it unfortunate that the theme, recurring throughout the majority opinion, is that the subject occurrence was merely an "almost" accident. This case will be cited for the proposition that there can be no traffic stop for violating the prohibition against negligent driving, unless there has been a collision. TR § 21–901.1(b) makes plain that the negligent driving need merely *endanger* person or property. There is no requirement for impact.

Particularly unfortunate, in my opinion, is the majority's reinforcement of its position by finding the police officers' testimony in this case too subjective to satisfy Fourth Amendment jurisprudence. The factual premise of the argument is

that the lack of any illegal activity is "evident." Opinion at 368–69, 920 A.2d at 1091. I have discussed this, above. In the majority's view, to allow a traffic stop based on an officer's belief that there has "almost" been a collision "practically destroys the objective basis of the reasonable suspicion requirement." Opinion at 368–69, 920 A.2d at 1091. There are, of course, rules of the road that similarly could be criticized as being subjective. For example, a motorist may violate a speed restriction when traveling below the posted speed limit. *See* TR § 21–801(a) ("A person may not drive a vehicle on a highway at a speed that, with regard to the actual and potential dangers existing, is more than that which is reasonable and prudent under the conditions."). *See also* TR § 21–310(a) ("The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the traffic on and the condition of the highway."). These are the kinds of violations that can lead to the apprehension of motorists driving under the influence of alcohol or drugs.

For the foregoing reasons, I dissent.

Judges RAKER and HARRELL authorize me to state that they join in this dissenting opinion.