*Ryan Lawrence Steck v. State of Maryland*, No. 705, September Term, 2017.  Opinion by
Battaglia, J.

**FOURTH AMENDMENT – PROBABLE CAUSE – CONTROLLED
SUBSTANCES – ODOR DETECTION – USE OF DOG**

Drug-detection dog's alert to presence of drugs in co-defendant's car was sufficient to
establish probable cause to search car, even though dog did not provide final, trained alert
that drugs were present, where dog's handler testified credibly that even though the dog
did not provide a final alert, the dog's behavior was consistent with the presence of drugs,
albeit in two places.

Circuit Court for Worcester County
Case No.: 23-K-16-000512

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 705

September Term, 2017

_____

RYAN LAWRENCE STECK

v.

STATE OF MARYLAND

_____

Woodward, C.J.,
Shaw Geter,
Battaglia, Lynne, A.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Battaglia, J.

_____

Filed:  November 28, 2018

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

Ryan Lawrence Steck, appellant, was convicted by a jury sitting in the Circuit Court for Worcester County of possession with intent to distribute heroin, possession of heroin, possession with intent to distribute cocaine, and possession of cocaine, after which the court sentenced him to a term of imprisonment for fourteen years.

Prior to trial, Steck had filed a Motion to Dismiss the charges against him, alleging that the State had destroyed exculpatory evidence. After having had his motion denied, the judge proceeded to hear evidence regarding Steck's Motion to Suppress, which was also subsequently denied. About two months later, but prior to trial, after receiving additional material from the State, Steck successfully filed a Motion to Reopen his Motion to Suppress, which was, again, ultimately denied. Before us, Steck presents the following questions for our review:

1. Did the lower court err in denying Mr. Steck's Motion to Suppress?

2. Did the lower court err in denying Mr. Steck's Motion to Dismiss?

Finding no error or abuse of discretion, we affirm, for the reasons set forth below.

## FACTUAL BACKGROUND

In the early morning of August 7, 2016, while working bicycle patrol in the area of First Street and St. Louis Avenue in Ocean City, Officer Dan McBride, of the Ocean City Police Department, observed a "2008 black Chevy Impala" with a "Delaware registration" stop at a stop sign and then make a left-hand turn, crossing over one lane of the roadway. At the suppression hearing, Officer McBride testified that when the "vehicle went to make a left-hand turn, it pulled out in front of a taxicab, which caused the taxicab [driver] to . . . slam on his brakes to avoid a collision with the vehicle."

Believing that the driver had committed a traffic violation, Officer McBride, according to his testimony, "broadcast a description of the vehicle and the occupants" over a radio network used by the Ocean City Police Department. The vehicle was subsequently stopped by Officer Neshawn Jubilee of the Ocean City Police Department. Officer McBride testified further that after broadcasting this information, he immediately began riding his bicycle to the area of the traffic stop, arriving within three or four minutes after witnessing the "unsafe lane change."

Upon arriving on the scene of the traffic stop, Officer McBride confirmed that the vehicle stopped was the Chevy Impala he witnessed nearly get into an accident with the taxicab and identified Etoyi Roach[1] as the driver, Steck in the backseat, and another passenger in the front seat. After speaking with the vehicle's occupants, Officer McBride testified that he walked to Officer Jubilee's patrol car, sat inside it, and "began issuing Mr. Roach a written warning [for the unsafe lane change] and then requested a K-9 unit to respond to the scene."

At the suppression hearing, Officer McBride informed the court that he chose to request a canine unit "based on the behavior of the occupants, which [was] noted in [his] report, as well as the information that Officer Jubilee had relayed[,]" including that "it took a little longer to pull over than usual . . . [the Impala] almost ran a red light when it pulled over and kind of coasted to a stop. And [Officer Jubilee] said that as he

---

[1] In a separate proceeding, Roach was convicted and also has an appeal pending before this Court. *Roach v. State*, No. 1899, Sept. Term, 2017.

approached the vehicle, the driver – the occupants were making some furtive movements around the vehicle."

Similarly, Officer Jubilee testified that, the Impala "did not stop until the ocean block of 8th street, which is three city blocks further than where I initiated the traffic stop." As he pulled up to the vehicle, he noticed that, "the occupants were looking around. Their hands were moving about the car. I did not know exactly what they were doing, but they were looking around at each other and their hands were also moving." The occupants of the vehicle provided Officer Jubilee their licenses upon request, and at that point, Officer McBride arrived on the scene and took control of the traffic stop. Officer McBride further testified that after he made his request for the canine unit, it took a "couple minutes" for a team to arrive, and he was still in the process of writing Roach's warning when it arrived.

At the suppression hearing, Deputy Christopher Larmore, of the Worcester County Sheriff's Office Patrol Division, testified, also, that he was in the area of Third Street and Atlantic Avenue when he received a request for canine support. He further testified that it took him and his canine partner, Simon, a "couple of minutes" to travel from the location wherein they received the request to the scene of the traffic stop. Upon the K-9 team's arrival, Deputy Larmore requested that Officer McBride and the other officers remove the occupants from the vehicle for safety reasons. Shortly thereafter, Deputy Larmore and Simon conducted a scan of the vehicle, at which time Roach, Steck, and the other passenger were all seated on a nearby curb. Deputy Larmore further related:

3

So I get up to scan the vehicle with my K-9 partner. I give him his command to scan the vehicle. . . . And at that point in time, I notice a change of his breathing and posture and his general behavior. And it's consistent with when he's in the odor of narcotics. . . .

When he got in the area of the rear passenger door, Your Honor, he began to go back and forth between sniffing the vehicle and sniffing the gusts of wind that were blowing from the general direction of the occupants. So, basically, at this point in time, he is showing the signs of behavior of being in odor, but he's actually going back and forth, trying to pull me in different directions.

Deputy Larmore explained through his testimony that since Simon was

kind of, fighting two different odors here, he won't actually go into what's called a final alert, which is his sit. That's his trained response. All of the other responses that he's giving me are involuntary responses. Those are the responses that he gives when he's in the odor of the five odors I just mentioned.[2]

When asked by Officer McBride whether Simon provided an alert at the scene, Deputy Larmore testified that he informed the lead officer that he "believed that the odor was mostly coming from the occupants and that's why [Simon] kept trying to pull me to them." Deputy Larmore further testified that Simon's behavior was "consistent with odor coming from the vehicle" and "odor coming from the individuals sitting on the curb."

Deputy Larmore also testified on direct examination that he believed the odor to have originated from the occupants, but explained that, perhaps, Simon was also indicating to the car because "of the odor having been recently in the vehicle from the occupants who obviously had gotten out just before." At the end of his direct

---

[2] According to Deputy Larmore, Simon, the drug detection dog, is certified to detect marijuana, cocaine, methamphetamine, heroin, and ecstasy.

4

examination, Deputy Larmore concluded that, at the time of the scan, he considered there to be "two sources" of the odor – the vehicle and the occupants.

Detective Corey Gemerek, of the Criminal Investigation Division, Ocean City Police Department, testified that after the scan was complete, he approached Steck and "asked if he had any drugs and/or illegal weapons on his person." According to Detective Gemerek, Steck replied "that he had a blunt inside his pocket."[3] Detective Gemerek then asked Steck to remove it from his pocket; Steck, in turn, "retrieved a clear plastic bag containing marijuana and handed it to" Detective Gemerek.[4] Detective Gemerek then handed Officer McBride the marijuana.

After the seizure of the marijuana, the officers searched the vehicle and, discovered one thousand bags of what turned out to be heroin.

## DISCUSSION

### Motions to Suppress

Steck filed two motions to suppress the seizure of the heroin, both of which were denied. All of the testimony discussed herein relates solely to that which was developed at the suppression hearings.

**"**When reviewing the denial of a motion to suppress evidence," appellate courts "ordinarily consider only the information contained in the record of the suppression hearing, and not the trial." *Lewis v. State*, 398 Md. 349, 358 (2007) (citations omitted).

---

[3] At the hearing, Detective Gemerek defined a blunt as a "hand-rolled marijuana cigarette."

[4] Detective Gemerek testified that the amount of marijuana in Steck's possession was likely less than ten grams.

5

In these cases, we are limited to viewing "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the prevailing party on the motion[,]" which here, is the State. *Id.* (citations omitted). While "we will not disturb the [circuit] court's factual findings unless clearly erroneous[,]" we "review legal questions *de novo*[.]" *Grant v. State*, 449 Md. 1, 14–15 (2016) (quoting *State v. Wallace*, 372 Md. 137, 144 (2002), *cert. denied*, 540 U.S. 1140 (2004)). Where a party "has raised a constitutional challenge to a search or a seizure, we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *Id.*

Steck proffers several arguments to support his claim that the heroin recovered from the vehicle should have been suppressed. He first argues that the initial traffic stop was unlawful, as it was not supported by reasonable articulable suspicion that a traffic violation had occurred. Specifically, he contends that neither Sections 21-309(b)[5] nor 21-402(a)[6] of the Transportation ("TR") Article, Maryland Code (1977, 2012 Repl. Vol.),

---

[5] TR § 21-309(b) provides:

> *Driving in a single lane required.* – A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.

[6] TR § 21-402(a) provides:

> *Turning left.* – If the driver of a vehicle intends to turn to the left in an intersection or into an alley or a private road or driveway, the driver shall yield the right-of-way to any other vehicle that is approaching from the

(continued)

6

was violated by the driver of the vehicle, Etoyi Roach, and as a result, the stop was illegal from its inception. Steck further avers that the traffic stop was "prolonged beyond the time necessary to effectuate the purpose of the stop, to write a warning ticket, in order to permit a K-9 unit to arrive and conduct a scan of the car." He next argues that there was no probable cause to search the vehicle, as the drug detection dog failed to provide "a positive alert" and that the dog handler failed "to explain why Simon did not positively alert to the car."

The State conversely avers that, "[t]he facts testified to by Officer McBride, which were credited by the suppression court, were sufficient to support a traffic stop based on a reasonable suspicion of a violation of TR §21-403(b) or (c),[7] for a failure to yield the right-of-way to a vehicle on a through highway." The State also argues that Steck's

---

(continued)

      opposite direction and is in the intersection or so near to it as to be an immediate danger.

[7] TR § 21-403(b) provides:

    *Stopping at entrance to through highway.* – If the driver of a vehicle approaches a through highway, the driver shall:
  (1) Stop at the entrance to the through highway; and
  (2) Yield the right-of-way to any other vehicle approaching on the through highway.

    TR § 21-403(c) provides:

    *Stopping in obedience to stop signs.* – If a stop sign is placed at the entrance to an intersecting highway, even if the intersecting highway is not part of a through highway, the driver of a vehicle approaching the intersecting highway shall:
  (1) Stop in obedience to the stop sign; and
  (2) Yield the right-of-way to any other vehicle approaching on the intersecting highway.

7

contention that the traffic stop was unnecessarily prolonged or abandoned to allow the canine unit to arrive and scan the vehicle is waived on appeal, because it was not preserved. In the alternative, if not waived, the State contends that there "was no unnecessary delay or abandonment of the original traffic stop[.]" The State next avers that "the canine's detection and indication of both the vehicle and the vehicle occupants as separate sources of the odor of drugs provided probable cause for police to conduct a warrantless search of the vehicle."

The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, protects individuals against unreasonable searches and seizures by the government. *Whren v. United States*, 517 U.S. 806 (1996); *United States v. Mendenhall*, 446 U.S. 544 (1980); *Lewis*, 398 Md. at 360–61. The Supreme Court has maintained that, the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren*, 517 U.S. at 809–10; *see also Holt v. State*, 435 Md. 443, 459 (2013).

The Fourth Amendment, however, is not "a guarantee against all searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (italics in original); *Cartnail v. State*, 359 Md. 272, 283 (2000). Therefore, the "touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)

8

(quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)); *Sellman v. State*, 449 Md. 526, 540 (2016) (quoting *Lewis*, 398 Md. at 361). In assessing the reasonableness of a traffic stop, the Supreme Court has adopted a "dual inquiry," examining "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682 (quoting *Terry*, 392 U.S. at 20).

A traffic stop is permissible under the Fourth Amendment "where the police have a reasonable suspicion supported by articulable facts that criminal activity is afoot." *Lewis*, 398 Md. at 361 (original citations omitted). Thus, a traffic stop violates the Fourth Amendment where there is no "reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws." *Delaware v. Prouse*, 440 U.S. 648, 650 (1979); *Rowe v. State*, 363 Md. 424, 433 (2001).

In assessing whether the articulable reasonable suspicion standard is satisfied, it is well settled that the police have the right to stop and detain the operator of a vehicle when they witness a violation of a traffic law. *Cartnail*, 359 Md. at 289. *See, e.g., Byndloss v. State*, 391 Md. 462 (2006) (validating a traffic stop where petitioner was stopped for having her license plate obscured by a plastic license plate cover); *State v. Green*, 375 Md. 595, 609 (2003) (stating that "when a police officer has probable cause to believe that a driver has broken a traffic law, the officer may detain the driver temporarily 'to

enforce the laws of the roadway, and ordinarily to investigate the manner of driving with intent to issue a citation or warning'" (quoting *Ferris v. State*, 355 Md. 356, 372 (1999))).

Steck not only urges this Court to find that the driver of the Impala did not violate Section 21-309(b) of the Transportation Article, the offense for which Mr. Roach ultimately received a citation, but also urges us to find that Mr. Roach "was lawfully operating his vehicle" and that "'almost' causing an accident is insufficient to support a traffic stop." Steck relies on *Lewis v. State*, a case in which the Court of Appeals did not uphold a traffic stop and subsequent vehicle search because the Court determined that Lewis had not violated any law, traffic or other. 398 Md. at 368.

What differentiates *Lewis* from the present case is that the motions judge found that, "the behavior, the actions, of [Roach] in driving the vehicle in front of the cab certainly is grounds for a traffic offense. So I find that that was warranted to have the vehicle pulled over and begin writing at that time what would have been a warning." The judge's finding was supported by the testimony of Officer McBride, who had a "clear and unobstructed view of the event" and observed the Impala pull "out in front of a taxicab, which caused the taxicab to hit his brakes in the roadway," in order to avoid a collision. Unlike *Lewis*, therefore, where police officers grounded their decision to stop a vehicle on an alleged traffic violation which was not one—the vehicle used its turn signal, began to pull into the street from a parallel parking space, and "nearly" struck the back of a police car—the behavior observed by Officer McBride and credited by the Circuit Court, in the present case, provided the officers reasonable suspicion to stop Mr. Roach's Impala.

Steck next contends that, even if "the traffic stop was lawful, it was nevertheless prolonged beyond the time necessary to effectuate the purpose of the stop, to write a warning ticket, in order to permit a K-9 unit to arrive and conduct a scan of the car." Steck further contends that Officer McBride "ceased writing the warning ticket so as to help focus on the dog sniff[,]" hence, abandoning the original purpose of the stop. The State counters that "there is no evidence that Officer McBride unnecessarily prolonged the original traffic stop, or abandoned" its original purpose because he was "still in the process of preparing the warning when the scan occurred, and aside from briefly speaking to [Deputy] Larmore when he arrived, there is no evidence that he suspended his activities in preparing a warning for Roach."

While the reasonableness of a "traffic-based detention is not measured by the clock alone," *State v. Ofori*, 170 Md. App. 211, 237, *cert. denied*, 396 Md. 13 (2006), it must also "be temporary *and last no longer than is necessary to effectuate the purpose of the stop*." *Id.* (italics in original). The purpose of a traffic stop should be limited to "the period of time reasonably necessary for the officer to (1) investigate the driver's sobriety and license status, (2) establish that the vehicle has not been reported stolen, and (3) issue a traffic citation[.]" *Pryor v. State*, 122 Md. App. 671, 682, *cert. denied*, 352 Md. 312 (1998). Police activity at a traffic stop, however, would not justify "a detention that extend[s] beyond the period of time that it would reasonably have taken for a uniformed officer to go through the procedure involved in issuing a citation to a motorist." *Id.*

When evaluating "the effect of the length of the detention, we take into account whether the police diligently pursue[d the purpose] of their investigation." *Henderson v.*

11

State, 416 Md. 125, 144 (2010) (quoting United *States v. Place*, 462 U.S. 696, 709 (1983)). Once the mission of the original traffic stop has been completed, "the continued detention of a vehicle and its occupant(s) constitutes a second stop and must be independently justified by reasonable suspicion." *Munafo v. State*, 105 Md. App. 662, 670 (1995).

A canine scan that occurs during a valid, lawful traffic stop may not be considered a Fourth Amendment "search" that requires additional reasonable suspicion or probable cause, *Gadson v. State*, 341 Md. 1, 8 n.4 (1995), *cert. denied*, 517 U.S. 1203 (1996), because drug detection dogs do not seek out items that are lawful to possess, only contraband, and as such, the "use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). It is "perfectly legitimate" to use a drug detection dog during a traffic stop as a "free investigative bonus," as long as the traffic stop is "still genuinely in progress." *Ofori*, 170 Md. App. at 235.

If a dog scan, however, unnecessarily exceeds the scope of the original seizure, then a Fourth Amendment violation has occurred. *Munafo*, 105 Md. App. at 670–72. Police officers may not prolong an initial stop to effectuate a canine search, especially when the purpose of that stop has been completed (*e.g.,* complete license check and ticket writing). *Florida v. Royer*, 460 U.S. 491, 500 (1983). *See Snow v. State*, 84 Md. App. 243, 267 (1990) ("The case at bar demonstrates a police officer's 'hunch' that there were illegal drugs in Snow's vehicle. It so happens that the 'hunch' was correct, but this does

12

not justify the seizure of Snow and his passenger, which was an additional intrusion on Snow's Fourth Amendment rights."). The issue turns on "not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff adds time to the stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015).

If the officer issuing the citation is diligently and "legitimately still working on those citations when the K-9 unit arrives, the traffic stop is still ongoing, and the detention will be considered reasonable for Fourth Amendment purposes." *Partlow v. State*, 199 Md. App. 624, 638 (2011) (citing *Ofori*, 170 Md. App. at 243). *See e.g.*, *Rodriguez*, 135 S. Ct. at 1613 (vacating a judgment which found it lawful to conduct a canine scan after police officer returned driver's license and issued a written warning for momentarily crossing into the shoulder—the purpose of the stop); *In re Montrail M.*, 87 Md. App. 420, 437 (1991), *aff'd*, 325 Md. 527 (1992) (affirming the legitimacy of a canine sniff that occurred during a traffic stop, where the deputy who initiated the stop was still running the defendant's license and registration when the canine scan took place).

While not entirely dispositive, time is a consideration in this calculus. For example, in *Padilla v. State*, this Court found that no Fourth Amendment violation occurred when a drug-sniffing canine provided an alert "within twelve minutes of the inception of the traffic stop, at a point when Trooper Kennard had not yet received the results of the registration and license check[.]" 180 Md. App. 210, 224, *cert. denied*, 405 Md. 507 (2008). *See also Wilkes v. State*, 364 Md. 554, 570 (2001) (validating a traffic stop where the "K-9 unit arrived on the scene and conducted the scan of petitioner's

Escort *prior to* Trooper Graham receiving radio verification of the validity of petitioner's driver's license, vehicle registration card, and warrants check" (italics in original)).

The motions judge in the present case, found that

[a]s far as the timeline goes, whether there was a delay longer than necessary to affect the purpose of the stop, I don't find that there was any undue delay. The stop was at 12:24. Officer McBride got there three or four minutes later, and Deputy Sheriff Larmore arrived at 12:32 with his dog out. So I don't find that that was an undue delay in light of the testimony that Officer McBride provided that he was still writing a citation.

The record supports that only an eight minute lapse in time occurred, which is not an undue delay, especially because the officer was writing the citation.

Steck, though, further argues that the traffic stop was unnecessarily prolonged such that its original purpose was abandoned to permit a canine scan of the vehicle. The State contends that Steck waived this argument on appeal because of his failure to bring it up at the suppression hearing, citing *Johnson v. State*, 138 Md. App. 539, 560, *cert. denied*, 365 Md. 267 (2001). In that case, Johnson argued on appeal that he was not advised of his *Miranda* rights until the end of a police interview and that he had asked for an attorney. *Id.* At trial, however, counsel for Johnson only had argued that Johnson was coerced into making his statements by physical force and threats, rather than a *Miranda*-based argument. *Id.* We, therefore, found that a *Miranda*-based theory was waived. *Id.*

In the instant case, at the suppression hearing, Steck argued that it was unlawful for the officers to delay the completion of the traffic warning to seek consent from Roach to search the vehicle, which occurred after Simon's scan, rather than the traffic stop was unlawfully prolonged by waiting for Deputy Lamore and Simon to arrive. Whether this

14

issue was properly preserved for our review or not, it is clear from the record that Steck's contention is, nonetheless, without merit because the judge found, based on the evidence at the suppression hearing, that Officer McBride was processing the citation at the time of the scan.

Steck next avers that, under the totality of the circumstances, "there was no probable cause to search the Impala[,]" as evidenced by "the failure of Simon to positively alert[.]" The State, conversely, argues that under "the totality of the facts and circumstances of [Deputy] Larmore's testimony and Simon's scan, detection, and indication of the vehicle as a source of drug odor," probable cause existed to search the vehicle despite the lack of a final, trained alert.

The Supreme Court has consistently held that a police officer "has probable cause to conduct a search when 'the facts available to [the officer] would warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)). The test for probable cause, however, "is not reducible to 'precise definition or quantification.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Probable cause "is a nontechnical conception of a reasonable ground for belief of guilt[,]" *State v. Wallace*, 372 Md. 137, 148 (2002), *cert. denied*, 540 U.S. 1140 (2004) (quoting *Doering v. State* 313 Md. 384, 403 (1988)), which "requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion." *Id.* (citations omitted). Our evaluation as to whether probable cause exists "requires a nontechnical, common sense evaluation of the totality of the

15

circumstances in a given situation in light of the facts found to be credible by the trial judge." *Id.* (citations omitted). It thus follows that police "must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably" permit a warrantless search. *Id.* at 148 (quoting *Collins v. State*, 322 Md. 675, 680 (1991)).

It is settled law in Maryland that when a drug detection dog "alerts to a vehicle indicating the likelihood of contraband, sufficient probable cause exists to conduct a warrantless '*Carroll*' search of the vehicle. *Id.* at 146. *See also Wilkes*, 364 Md. at 586 ("We have noted that once a drug dog has alerted a trooper 'to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle].'" (quoting *Gadson*, 341 Md. at 8)); *Stokeling v. State*, 189 Md. App. 653, 664 (2009), *cert. denied*, 414 Md. 332 (2010) (finding that the dog's "alert to the Chrysler gave the police probable cause to search it for illegal drugs"); *Ofori*, 170 Md. App. at 221 ("[O]nce the K-9 'alerted' to the probable presence of contraband drugs in the [vehicle], all Fourth Amendment uncertainty came to an end."). There may be situations, however, where a drug detection dog fails to provide its final alert, but probable cause exists, based upon the evidence presented.

The Eighth and Tenth Circuit Courts of Appeals have held that probable cause exists in a situation in which a drug detection dog failed to provide its final, trained alert, but nonetheless, exhibited behavior consistent with positive drug detection, based upon the testimony presented by its handler. *See United States v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014), *cert. denied*, 134 S. Ct. 2890 (2014). In *United States v. Holleman*,

16

the K-9 officer-handler explained why his dog, Henri, may have failed to give a final, trained alert. *Id.* at 1156–57. The officer-handler stated that Henri may have been so overwhelmed by the odor of marijuana that he had difficulty pinpointing the strongest source of the odor. *Id.* at 1157. As Henri traced the passenger-side of Holleman's truck, the officer-handler stated that Henri "stop[ped] dead in his tracks and be[gan] to really detail the area between the bed of the truck and the cab of the truck." *Id.* at 1154 (alteration in original). The officer-handler then "pulled Henri away" from the truck and directed him "to sniff the vehicle parked next to Holleman's truck." *Id.* Henri "did not alert, indicate, or otherwise change his behavior when sniffing" the other vehicle. *Id.* Henri was then directed to re-sniff Holleman's truck, and upon doing so, "stopped and detailed the same area as the first time." *Id.* As such, the officer-handler concluded that Henri was informing him that Holleman's truck, more likely than not, contained contraband. *Id.*

The Eighth Circuit, thus, held that, "[c]onsidering 'all the facts surrounding [Henri's] alert[s], viewed through the lens of common sense,' we conclude those facts 'would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.' We are thus satisfied Henri's sniffs were 'up to snuff.'" *Id.* at 1158 (quoting *Harris*, 568 U.S. at 248). In so finding, the court reasoned that its Fourth Amendment jurisprudence did not "require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers." *Id.* at 1156. As long as law enforcement officers are able to "articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, [the] Court will not

17

engage itself in the evaluation of whether that dog should have an alternative means to indicate the presence of drugs." *Id.* (quoting *United States v. Clayton*, 374 F. App'x 497, 502 (5th Cir. 2010)).

Similarly, in *United States v. Parada*, the United States Court of Appeals for the Tenth Circuit determined that the district court did not clearly err in finding that Rico, the drug detection dog, provided sufficient probable cause to search a vehicle, despite the fact that Rico did not act commensurately with his typical final, trained alert in "stiffening his body, breathing deeply, and attempting to jump into the window." 577 F.3d 1275, 1281 (2009), *cert. denied*, 560 U.S. 927 (2010). In so holding, the appellate court necessarily deferred to the trial judge's evaluation of the testifying officer's credibility. *Id.*

The officer-handler, Officer Oehm, like the officer-handler in *Holleman*, explained that while Rico did not provide his final, trained alert, the fact that Rico "stiffened" and began to breathe deeper and more rapidly, provided him with probable cause to believe that the vehicle contained contraband. *Id.* Upon detecting the odor of drugs, Rico attempted to jump through the window of the vehicle, but Officer Oehm pulled him back before he could enter the car. *Id.* at 1279. Officer Oehm further testified that, but for preventing Rico from entering through the window, he believed that Rico would have provided his final, trained alert. *Id.* Based on this explanation, the court rejected "the stricter rule urged by [the defendant]," which would require a dog to give its final, trained alert, as it found Officer Oehm's testimony about Rico's behavior demonstrating probable cause more credible than the defendant's expert. *Id.* at 1282.

18

In addressing whether a dog's conduct provides a sufficient basis for probable cause for a warrantless car search, evaluation of the credibility of the dog's handler and other witnesses on the scene is key. In the present case, the judge specifically commented on the "compelling" nature of Deputy Larmore's testimony, finding the dog's behavior indicative that drugs were present:

> [n]ow, you indicated if – if we're going to go beyond an alert and have the issue determined by the handler's reading of the dog's behavior at the car. Well, that's where we're going, so maybe you could make some new law. But I find that the testimony of Deputy Larmore was very compelling and specific as to what the dog did for him to determine that, in fact – even though I've used the word alert, it's not the quote/unquote "alert", but an indication that there were drugs there.

> So based on all that, I'll deny your motions.

The motions court did not err in finding that, based on Deputy Larmore's testimony, the probability that a search might yield contraband, based on Simon's scan which was consistent with the presence of narcotics, amounted to probable cause. Because probable cause existed to search the car in the instant case, the fruits of that search were admissible.

Steck, however, posits that a drug detection dog must provide a trained, final alert in order for probable cause to exist, relying on two non-persuasive and wholly distinguishable federal district court opinions to support this position. We do not think such a stringent rule practical nor in accord with Fourth Amendment jurisprudence.

Steck cites *United States v. Heir*, in which the court found that probable cause did not exist to search a vehicle when the drug detection dog, Robbie, "alerted" to the

19

presence of drugs by sniffing more intensely around certain parts of the vehicle. 107 F. Supp. 2d 1088, 1091 (D. Neb. 2000). There, the dog was trained to provide an "aggressive" alert when he detected drugs by pawing and scratching at the car. *Id.* While the dog did not provide its trained response, his handler, Trooper Duis, testified that Robbie's alert was "subtle" and might only be recognized by himself or another person familiar with Robbie's behaviors, but nonetheless, should be seen as a valid basis for probable cause. *Id.* The court, however, disagreed and suppressed the evidence discovered in the vehicle, finding that "there must be an objectively observable 'indication' by the dog of the presence of drugs" because the behavior described by Trooper Duis was too subjective to use as a standard to establish probable cause. *Id.* The court also questioned the credibility of the handler's testimony because there was testimony that he may have cued the dog. *Id.* at 1096. In the present case, the judge found that indication, and there was no evidence adduced of cueing.

Steck also erroneously relies on *United States v. Heald*, 165 F. Supp. 3d 765 (W.D. Ark. 2016), as authority to support his claim that anything short of a trained, final alert can never support a finding of probable cause. In *Heald*, the drug detection dog, Bosco, was negatively impacted by the heat at the time he was directed by Officer Hernandez to scan the vehicle in question. *Id.* at 777–78. The government's own expert even testified that he could see from the video of the scan that Bosco's performance had been so adversely affected. *Id.* at 778. Officer Hernandez, the handler, testified that he was uncertain about whether Bosco's behavior—jumping into the air conditioned car—even constituted an alert and "debated" it "because Bosco is never supposed to jump in

20

cars." *Id.* at 779. The court suppressed the evidence and found that "a reasonable person would no doubt share Officer Hernandez's skepticism. An overheated dog exhibiting a new and untrained behavior is not a shining example of reliability." *Id.* In so finding, however, the court noted that it "does not intend to imply that anything less than a full, final indication is inherently unreliable. On the contrary, in most circumstances such actions may be reliable." *Id.* at 779, n.20 (citing *United States v. Holleman*, 743 F.3d 1152 (8th Cir. 2014); *United States v. Parada*, 577 F.3d 1275, 1281–82 (10th Cir. 2009); *United States v. Clayton*, 374 F. App'x 497, 500–02 (5th Cir. 2010)). The court made clear that

> on a spectrum of reliability, a final indication consistent with the K-9's training is at the most reliable end, and other changes of behavior fall somewhere short of that. As the Court makes clear below, this fact alone— in isolation—would not cause it to doubt Bosco's reliability. Rather, it is one factor viewed in combination with several others identified by the Court herein, including, for example, Officer Hernandez's uncertainty about whether Bosco's jump could even be classified as an alert.

*Id.*

In the present case, again, the judge found Deputy Larmore's testimony "compelling" to inform the handler that it was probable that drugs would be found in the Impala. The judge's finding was supported by Deputy Larmore's testimony, wherein he explained that he recognized Simon's behavior to be "consistent with when he's in the odor of narcotics" and provided a credible explanation as to why Simon went "back and forth" between the vehicle and its occupants sitting on the curb.

## Motion to Dismiss

Steck moved to dismiss the case against him before trial, arguing that the State wrongfully destroyed police records that he had requested be preserved by letter on October 3, 2016, which asked "that all dispatch records, radio logs and recordings of radio communications by the Ocean City Police Department and any other agencies that participated in this stop in the investigation be preserved and maintained." In writing the letter, defense counsel aimed "to enlist [the State's Attorney's] assistance in preserving these items for later discovery," and requested that the State's Attorney's Office "direct those law enforcement agencies that regularly report" to it, to "retain and preserve [those] items for later discovery." The State's Attorney's Office received the letter on October 5, 2016, but Steck's counsel never received a reply. A formal discovery request for the material, however, was not made until January 3, 2017, when Steck's counsel entered his appearance.

The State's Attorney, however, informed Steck's counsel that Emergency Services of Worcester County "only keep[s] their radio communications for 90 days after the event." The radio recordings requested by Steck had been destroyed on November 6, 2016.

Steck, before us, contends that the trial court abused its discretion in denying his motion to dismiss the charges against him because the exculpatory value of the police recordings "was of such a nature that no comparable evidence could be obtained." Had the recordings been properly preserved, he argues, they "could have established that [he] was illegally arrested after an unlawful search of the car . . .. [that a]ll of the evidence

22

against [him] emanated from the unlawful search of the car and thus, without this evidence, the state could not have obtained a conviction." Steck further avers that, "at the very least," the evidence sought was "potentially useful" and "destroyed in bad faith." Steck proffers that the State acted in bad faith because it received the letter requesting the preservation of the recordings, the request was "acknowledged by the State[,]" but the State "did nothing to prevent the destruction of the tapes by the police department and gave the defense no warning that, after 90 days, it would be destroyed."

The State counters that it was under no duty to preserve the evidence and that the recordings possessed no exculpatory quality. The State argues that "Steck presented nothing to support a claim that the recordings contained apparently exculpable evidence" that was not otherwise reflected in the event reports obtained by him, which reflect the timing of the radio calls. Furthermore, the State claims that "there is no evidence that even if the [police] recordings were improperly destroyed, that Steck was so prejudiced as to justify the extreme sanction of dismissal." Finally, the State alleges that because the recordings were destroyed in accordance with police policy, no bad faith existed to support Steck's due process challenge.

Although dismissal could be envisioned for discovery violations under Rule 4-236(d), it is "well-settled . . . that the sanction of dismissal should be used sparingly, if at all." *State v. Graham*, 233 Md. App. 439, 459 (2017) (quoting *Thompson v. State*, 395 Md. 240, 261 (2006)). Rule 4-263(d) provides, "[w]ithout the necessity of a request, the State's Attorney shall provide to the defense: (5) *Exculpatory Information*. All material or information in any form, whether or not admissible, that tends to exculpate the

23

defendant or negate or mitigate the defendant's guilty or punishment as to the offense charged[.]"  A defendant that alleges a discovery violation, must demonstrate that the evidence possesses exculpatory value, value that was apparent before it was destroyed, and "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

Similarly, where an appellant alleges a due process violation based on the failure of the State to preserve "potentially useful evidence," as Steck does here, the appellant must demonstrate that the State acted in bad faith, a high standard for an individual to satisfy, typically found only in the most egregious of cases. *Arizona v. Youngblood*, 488 U.S. 51 (1988).

The judge herein found that the destroyed materials had no probative value.  He further found that there was "no willful destruction of the evidence by the State's Attorney's Office or any of the underlying police agencies."  As a result, there was no violation of Rule 4-263(d) nor a due process violation with respect to the records.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**