2023 IL App (4th) 230179

NO. 4-23-0179

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 19, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Henry County |
| JAMES H. KENDRICKS, | ) | No. 20CF32 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Terence M. Patton, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Turner and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1        In the Henry County circuit court, a jury found defendant, James H. Kendricks,
guilty of unlawful cannabis trafficking (720 ILCS 550/5.1(a) (West 2020)), unlawful possession
of cannabis with the intent to deliver (*id.* § 5(f)), and unlawful possession of cannabis (*id.* § 4(f)).
The court sentenced him to imprisonment for 10 years.

¶ 2        Defendant appeals, claiming the circuit court erred by denying his motion for the
suppression of evidence. Specifically, he makes two arguments. First, he argues that an Illinois
state trooper temporarily seized his car without reasonable, articulable suspicion to justify the
seizure. Second, defendant argues that, without probable cause, a drug detection dog trespassed on
the exterior of his car, thereby subjecting his car to an unreasonable search.

¶ 3        We hold, first, that the trooper could honestly rely on Illinois case law that a dog
sniff of the exterior of a car parked in a public place is neither a search nor a seizure within the

meaning of the fourth amendment (U.S. Const., amend. IV). Second, we hold that, as soon as the trained, certified drug detection dog went "into odor" two seconds after approaching defendant's car, the trooper could honestly believe he had probable cause to search the car—before the dog touched the car. Therefore, under the good-faith exception to the exclusionary rule, we affirm the circuit court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        At the hearing on the motion for suppression, an Illinois state trooper, Andrew Scott, testified that in 2019 he took a K-9 training course at the Illinois State Police Academy in Springfield, Illinois. It was a 320-hour, 10-week course accredited by the Illinois Law Enforcement Standards Board. Scott completed the course and received a certification in narcotics detection. The certification testing included a dog, which had to detect, with 100% accuracy, the odors of methamphetamine, cocaine, and heroin. The dog was trained to give a final alert when it located the area where the drug odor was most intense. This final alert was a passive alert: the dog sat or lay down with its nose close to the source of the strongest odor.

¶ 6        On January 24, 2020, with the dog kenneled in his squad car, Scott passed a red Kia automobile with Alabama license plates. He turned around and followed the Kia to a gas station in Geneseo, Illinois. He parked on the opposite side of the pump as the Kia and went into the gas station. He asked the man who had been driving the Kia, defendant, if he would consent to a dog sniff of the car. Scott knew he did not need consent to do an exterior dog sniff in a public place. Nevertheless, he liked to find out if the person maybe had something to hide. Defendant answered that he did not consent. Scott exited the gas station and ran the dog around the Kia anyway. The dog sniff was videoed by the surveillance system of the gas station. The video was played in the suppression hearing.

¶ 7          After playing the video, the prosecutor asked Scott questions about it. Scott testified that a mere "two seconds after starting the sniff," the dog "went into odor." The passive alert, Scott explained, was only the final alert, signifying that the dog had found the area of the Kia where the odor was strongest. Initially, however, before giving the passive alert, the dog went into odor, "show[ing] the distinct change of behavior at the driver's door, a quick head snap." "Once he goes into odor," Scott explained, "he's trying to find the source of that odor." So, as soon as the dog perked up and became interested—or went into odor—Scott inferred that the dog had detected the smell of methamphetamine, cocaine, or heroin seeping out of the Kia. Then the only remaining question was specifically where in the car the contraband was located, a question that ultimately would be addressed, supposedly, by the passive alert. After going into odor, the dog was occupied with "detailing," trying to find where on the Kia the odor was most intense. In Scott's description of this detailing, the dog

> "[b]egan sniffing the rear door and made his way back to the trunk. Same thing, detailing the trunk, came back around to the driver—or to the front bumper and he pulled me right to that driver's door. Pressed his nose against the door handle. Put his paws up on the door and passenger door, detailed the scene, lowered into a sit."

After the dog had almost instantaneously picked up a scent and was going at the unoccupied car this way to find out where the scent was most powerful, defendant and his brother, Fred Kendricks, came out of the gas station. They protested. Defendant demanded that Scott state his badge number. Scott replied he would give them his badge number as soon as he was finished with the dog sniff.

¶ 8          The prosecutor asked Scott:

> "Q. You had not told the Kendricks[es] they were not free to leave until the very end of the footage that was previously played by defense counsel?

- 3 -

A. That is correct.

Q. And that occurred after you were putting the K-9 back into your squad car?

A. Yes, ma'am. Once I put [the dog] back in his kennel, I closed the door and walked around the pump to address both the Kendricks brothers. \*\*\*

Q. At any point while you were conducting the free-air sniff, did you ever tell either of the subjects that they couldn't get into their vehicle or couldn't leave?

\* \* \*

A. While I was doing the free-air sniff? No.

Q. Did they ever make any attempt to get in the vehicle at that point?

A. No, ma'am."

Scott testified, however, that as far as he was concerned, as soon as the dog went into odor two seconds after beginning the sniff, defendant and his brother were "not free to leave" (although Scott had not yet told them so).

¶ 9        As it turned out, methamphetamine, cocaine, or heroin was not found in the Kia. Instead, 10 pounds of marijuana was found in the trunk.

¶ 10                                     II. ANALYSIS

¶ 11        On appeal, defendant makes essentially two arguments.

¶ 12        First, defendant argues that the dog sniff was an unconstitutional seizure of the Kia, a car that was in his possession. The fourth amendment (U.S. Const., amend. IV) allowed Scott to seize the car for a brief investigation only if he were aware of "specific articulable facts" that would justify a suspicion that the car contained narcotics. See *United States v. Place*, 462 U.S. 696, 706 (1983). The dog sniff itself, defendant argues, was such a seizure—and it was an unreasonable

seizure, he continues, a seizure unsupported by specific, articulable facts to justify an inference that the car contained narcotics. The fourth amendment prohibits unreasonable searches and seizures (see U.S. Const., amend. IV), as does the Illinois Constitution (Ill. Const. 1970, art. I, § 6).

¶ 13        Second, defendant argues that because the dog placed its paws on his car and its snout underneath his car in an attempt to find drugs, the dog sniff was a trespass upon his car and therefore an unconstitutional search of his car: a warrantless search unsupported by probable cause. See *People v. Mallery*, 2023 IL App (4th) 220528, ¶ 21 (holding that "[a]lthough a police officer may search a vehicle without a warrant, the officer's search must still be supported by probable cause").

¶ 14        If we can avoid these constitutional questions by applying the judicially created, nonconstitutional good-faith exception, we should do so. See *People v. Parlier*, 2023 IL App (4th) 220091, ¶ 32; see also *People v. White*, 2011 IL 109689, ¶ 148 ("Certainly, it is a fundamental rule of judicial restraint that a court not reach *constitutional* questions in advance of the necessity of deciding them." (Emphasis in original.)). When "the police conduct a warrantless search under an objectively reasonable belief that their actions were sanctioned by 'binding appellate precedent' in existence at the time," there is a "good-faith exception to the exclusionary rule." *People v. Potts*, 2021 IL App (1st) 161219, ¶ 113. Thus, even though Scott lacked a warrant to search the Kia, the evidence should not be suppressed if he had an objectively reasonable belief that binding appellate case law supported his actions. We decide *de novo* whether this case falls into the good-faith exception. See *id.* ¶ 109.

¶ 15        Corresponding to the two issues that defendant raises on appeal, the good-faith question is twofold. First, on the basis of binding appellate precedent, could Scott have believed, in good faith, that a dog sniff of the exterior of a car parked in a public place was neither a search

nor a seizure? Second, on the basis of binding appellate precedent, could Scott have believed, in good faith, that the dog's going into odor upon approaching the car—before making any physical contact with the car—created probable cause to search the car? As we will explain, the answer to both of those questions is yes.

¶ 16   Let us begin with the first question. At the time Scott ran the dog around the Kia, there were decisions by the Illinois Appellate Court holding that a canine sniff of the exterior of a motor vehicle parked in a public place was neither a search (*People v. Ortiz*, 317 Ill. App. 3d 212, 223 (2000)) nor a seizure (*People v. Thomas*, 2018 IL App (4th) 170440, ¶ 60). Therefore, even though defendant claims that by subjecting the Kia to an exterior dog sniff, Scott temporarily detained the Kia, Scott had a good-faith basis for thinking otherwise. Before conducting the dog sniff and while conducting it, Scott did not detain defendant or his car "by means of physical force or a show of authority." (Internal quotation marks omitted.) See *People v. Bujari*, 2020 IL App (3d) 190028, ¶ 47. As the appellate court put it in *Bujari*:

> "[P]olice must have reasonable suspicion to justify *detaining* someone for the purpose of performing a dog sniff. [Citations.] However, police officers do not need independent reasonable articulable suspicion of drug-related activity to perform a dog sniff because a dog sniff is not, in itself, either a search or a seizure within the meaning of the fourth amendment." (Emphasis in original.) *Id.* ¶ 49.

Granted, *Bujari* was issued the month after the canine sniff of the Kia. Even so, if the appellate court could arrive at the above-quoted conclusions in *Bujari*, Scott could have legitimately arrived at the same conclusions. He did not *detain* defendant or his car for the purpose of performing a dog sniff. See *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Nor, before conducting the dog sniff, did he carry away defendant's personal property and keep it for a long time as in *Place*,

462 U.S. at 699. While avoiding the pitfalls in *Rodriguez* and *Place*, Scott could have honestly relied on *Ortiz* and *Thomas*, which were " 'binding appellate precedent[s].' " *Potts*, 2021 IL App (1st) 161219, ¶ 113.

¶ 17 It is true that, after *Thomas* and *Ortiz*, the United States Supreme Court issued a decision holding that "physically entering and occupying" *the home*—including its curtilage, which was "part of the home itself"—to conduct a canine sniff was a search within the meaning of the fourth amendment. *Florida v. Jardines*, 569 U.S. 1, 5-6 (2013). The Kia, however, was not defendant's home—what the Supreme Court characterized as the "first among equals" for purposes of the fourth amendment (*id.* at 6). Nor was the Kia parked at defendant's home; rather, it was parked at a gas station. See *People v. Burns*, 2016 IL 118973, ¶ 55 (agreeing with the appellate court that "use of a drug-detection dog to sniff a home in the hopes of discovering incriminating evidence presents a very different issue than use of drug-detection dogs on automobiles during a lawful traffic stop and in public areas"). Nor did Scott, merely by running his dog around the Kia, "physically enter[ ] and occupy[ ]" the Kia. See *Jardines*, 569 U.S. at 6. Therefore, Scott could have reasonably regarded *Jardines* as distinguishable for multiple reasons, and he could have reasonably regarded *Ortiz* as still the applicable law.

¶ 18 To be sure, another decision by the United States Supreme Court, *United States v. Jones*, 565 U.S. 400 (2012), was somewhat closer to Scott's circumstances in that *Jones* at least involved a motor vehicle. See *id.* at 402. On the other hand, however, *Jones* was farther from his circumstances in that it involved the installation of Global Positioning System (GPS) tracking device on the vehicle instead of a dog sniff of the vehicle's exterior. See *id.*

¶ 19 In *Jones*, the defendant appealed his conviction of conspiracy to distribute cocaine. *Id.* at 403-04. He claimed a violation of the fourth amendment in that, without a search warrant,

the police had attached a GPS tracking device to the undercarriage of his Jeep while his Jeep was parked in a public parking lot. *Id.* at 403. The United States Court of Appeals for the District of Columbia reversed the conviction, holding that the "admission of the evidence obtained by warrantless use of the GPS device" had "violated the Fourth Amendment." *Id.* at 404. Agreeing with that holding, the Supreme Court remarked, "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404-05. Until the second half of the twentieth century, the Supreme Court noted, "our Fourth Amendment jurisprudence was tied to common-law trespass." *Id.* at 405. The fourth amendment "was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 406. The Supreme Court concluded that "[w]here, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred." *Id.* at 406 n.3.

¶ 20        Defendant complains that, in the present case, the dog "put his paws on the trunk of the vehicle and on either the driver's door or the driver's side front fender." Because this trespass, as defendant terms it, was "for the purpose of obtaining information" (*id.* at 404), the Kia was subjected to a search, by defendant's reasoning (see *id.* at 408 n.5)—and he characterizes the search as unreasonable, a violation of the fourth amendment, because, in his view, the search was unsupported by probable cause (see *Mallery*, 2023 IL App (4th) 220528, ¶ 21). According to the State, however, "the evidence establishes that [the dog] alerted to the presence of narcotics before he ever put his paws on the vehicle, rendering any later contact immaterial." Defendant does not appear to disagree that before laying a paw on the Kia, the dog went into odor. The dog smelled

drugs almost instantaneously upon approaching the car, and the subsequent actions of the dog in putting its paws on the car were merely "detailing," the dog's attempt to find exactly where in the car the drugs (apparently inferred to exist) were located.

¶ 21　　　　We acknowledge that, ultimately, in the search of the car's interior, the police found cannabis instead of methamphetamine, cocaine, or heroin. However, we assess probable cause on the basis of what Scott knew at the time. See *People v. Flora*, 2023 IL App (4th) 220926-U, ¶ 13 ("An officer has probable cause when the totality of the facts and circumstances known to the officer at the time of the search would justify a reasonable person in believing the vehicle contains contraband or evidence of criminal activity."). Scott knew at the time that a dog trained and certified to detect methamphetamine, cocaine, and heroin with 100% accuracy went into odor when approaching the Kia.

¶ 22　　　　The positive behavior of a drug sniffing dog preceding its passive alert—its visible act of going into odor before pinpointing where in the car the drugs are located—has been held to create probable cause to believe that drugs are in the car. See *Steck v. State*, 197 A.3d 531, 543-44 (Md. Ct. Spec. App. 2018) (despite the lack of a final, trained alert, the police had probable cause to believe that the vehicle contained drugs because the dog went into odor); *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) (a general alert is enough to provide probable cause, and it is unnecessary for "the dog to give a final indication before probable cause is established"). We do not mean to suggest it was the responsibility of a reasonable Illinois state trooper to know *Steck*, *Parada*, and other fourth amendment precedents from foreign jurisdictions. We merely suggest that if *Steck* and *Parada* could conclude that a dog's giving a general alert, or going into odor, was enough to create probable cause, a reasonable police officer in Scott's circumstances

could have likewise so concluded. (Otherwise, *Steck* and *Parada* would have to be dismissed as products of bad faith.) The United States Supreme Court has held:

> "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013).

If a court can make that presumption, so can a police officer. An alert from a certified dog, such as the dog in this case, can be reasonably trusted—and it can be a general alert, a going into odor. Trooper Scott was able to describe how the dog acted when it went into odor, and we will " 'not engage *** in the evaluation of whether [the dog] should have used an alternative means to indicate the presence of drugs.' " *McKinney v. State*, 212 N.E.3d 697, 706 (Ind. Ct. App. 2023).

¶ 23 In sum, then, binding appellate precedent, such as *Ortiz*, 317 Ill. App. 3d at 223, and *Thomas*, 2018 IL App (4th) 170440, ¶ 60, informed Scott that a canine sniff of the exterior of a motor vehicle parked in a public place was neither a search nor a seizure within the meaning of the fourth amendment. *Thomas* likewise informed him that "[i]f a dog smells drugs in a vehicle, the police have probable cause to search the vehicle." *Id.* ¶ 74. *Thomas* did not say that if a dog gave a final alert, the police had probable cause to search the vehicle. Rather, *Thomas* said that "[i]f a dog smells drugs in a vehicle, the police have probable cause to search the vehicle." *Id.* We could not fairly blame a police officer for taking *Thomas* precisely at its word. Going into odor means smelling drugs in the vehicle. Two seconds after the dog sniff of the Kia began, the dog visibly went into odor, thereby signifying it smelled the odor of drugs emanating from the car's interior. At that point, before either he or the dog touched the car, Scott could honestly believe he

had probable cause to detain and search the car. He could reasonably believe he had a privilege to commit what otherwise might have been a trespass to chattels. See Restatement (Second) of Torts § 10(2)(b), (c) (1965). Arguably, a privilege meant there was no trespass and, hence, no search within the meaning of *Jones*. See *Jones*, 565 U.S. at 408 n.5 (trespass "conjoined with *** an attempt to find something or to obtain information" is a search).

¶ 24   The upshot is this: on the undisputed material facts of this case, we see no police misconduct to deter. Therefore, we agree with the denial of defendant's motion for the suppression of evidence. See *Potts*, 2021 IL App (1st) 161219, ¶ 113; *People v. McDonough*, 395 Ill. App. 3d 194, 199 (2009).

¶ 25          III. CONCLUSION

¶ 26   For the foregoing reasons, we affirm the circuit court's judgment.

¶ 27   Affirmed.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Henry County, No. 20-CF-32; the Hon. Terence M. Patton, Judge, presiding. |
| **Attorneys for Appellant:** | Omer Jaleel, of Rolling Meadows, for appellant. |
| **Attorneys for Appellee:** | Catherine L. Runty, State's Attorney, of Cambridge (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |